[No. 52955–8. En Banc. June 9, 1988.]

THE STATE OF WASHINGTON, *Respondent,* v. DAVID
LEWIS RICE, *Appellant.*

*Michael A. Frost* and *Hal Sheets,* for appellant.

*Norm Maleng, Prosecuting Attorney, Robert S. Lasnik, Chief of Staff,* and *William L. Downing, Senior Deputy,* for respondent.

DURHAM, J.—A King County Superior Court jury found David Lewis Rice guilty on four counts of aggravated first degree murder and in the special sentencing hearing concluded that leniency from the death penalty was not merited. Accordingly, the trial court sentenced Rice to death. We affirm.

## FACTS

In the early evening hours of Christmas Eve 1985, guests arrived at the home of Seattle attorney, Charles Goldmark, his wife, Annie, and their children to share in a holiday dinner. All the lights but one were out, and there was no response when they rang the doorbell. The guests waited 15 or 20 minutes, but when there was still no sign of their hosts, they went home. After repeated telephone calls yielded a busy signal, they became alarmed and returned to the Goldmark residence. This time they thought they could hear moaning coming from inside the house. They drove to the nearby home of Jeffrey Haley, where they knew they could find a key to the Goldmark house. They returned to the Goldmark residence with Jeffrey Haley and his brother, Peter.

When Peter and Jeffrey Haley entered the house, the moaning became "very loud and very disturbing." When they got to the top of the stairs, they saw a body lying on the floor of the master bedroom. They entered the room and found three more bodies. The bodies were those of Charles Goldmark, his wife, Annie, and their two children, 10–year–old Colin and 12–year–old Derek. Annie appeared to have a stab wound in her chest, while Charles and the boys all appeared to have head wounds. Charles and Annie

had been handcuffed with their arms behind their backs. Charles was yelling and thrashing about on the floor but in his delirious state did not seem aware of the Haleys' presence. They used a hacksaw to remove Charles' handcuffs in an attempt to ease his distress.

Members of the police and fire departments arrived at the Goldmark residence a short time later. The fire fighters began giving medical attention to the victims and the police began gathering evidence. In the master bedroom, the police found the knife and steam iron that had apparently been used in attacking the family. Annie Goldmark was pronounced dead at the scene. The two boys were found with sweaters knotted so tightly around their necks that the fire fighters could not insert their fingers under the sweaters. Blood had splattered on virtually every wall, concentrating around the areas of the bodies. The pattern of the bloodstains around the room indicated that the victims had probably been struck while they were lying on the floor. Shortly thereafter, medical personnel arrived, treated the victims, and took them to the hospital. Charles, Colin and Derek all died within the next 5 weeks.

On December 26, the police received a telephone call from a Robert Brown a/k/a Husayn Omar Sayfuddiya telling them his belief that an overnight guest in his apartment was involved in the Goldmark killings. The night before, Brown had opened his guest's notebook, without the knowledge of his guest, and had read a letter saying, "To whom it may concern, I am the person you are looking for in the Goldmark case." Police met Robert Brown near his apartment and talked to him briefly. Brown said that the guest's name was David Rice. While waiting for some detectives to arrive, the police saw a man matching Rice's description descend the apartment steps and walk down the street. As the police approached him, he turned and ran. The police chased and caught him a few blocks later when, in mid–chase, the suspect stopped running, removed a vial from his pocket, took a drink from its contents, and

threw away the vial. The police retrieved the vial, and subsequent analysis indicated that it contained liquid nicotine.[1] The suspect identified himself as David Rice. Brown retrieved the notebook from his apartment building and gave it to the police.

Rice was taken into custody and was informed of his *Miranda* rights. A detective showed him the letter that Robert Brown had given them, and Rice admitted that he had written it. The full text of that letter reads as follows:

To whom it may concern,

I am the person you are looking for in the Goldmark case.

I know that what I did was a very terrible thing. That is why I am as you see me now.

I want it perfectly understood that no one else had anything whatsoever to do with what I did. I went to great lengths to make sure of that.

The person that I live with doesn't even know that I am wanted on a different charge. She received a couple of messages on her machine, but I erased them before she got to them.

I did not use the rifle that I purchased a few weeks ago, instead, I fooled them with a toy pistol which you will find in the storage locker. I threw the rifle ["pistol" was originally written, then crossed out] away a couple of weeks ago.

Again, I want it understood that no one knew anything about this, so please do not cause any unnecessary suffering to innocent people. I think that I've already done enough.

I guess I should tell you why I did what I did. That way, you won't have to ask other people about it. My life is a mess. It has been since my wife left. Anne has been trying to help me straighten it out, but I'm afraid

The detective asked Rice if he wanted to complete this note. Rice agreed, and finished it by writing,

I am afraid that she isn't able to do much for me. I am much too far gone.

---

[1]Later that day, Rice told the police that he used the nicotine as a substitute for smoking, and that he drank it in mid-chase because he knew that he would not be allowed to have any while he was in jail.

When I left high school, I could go out and get a job in any town, at any time I needed one.

When I got married, jobs were starting to get scarce. I had to do more walking & searching to find work. I found myself more and more on the unemployment line, which was getting longer and longer.

I went to the government offices to see what I could do to alleviate my employment situation, and they recommended that I go to school & learn engineering.

At this point, Rice told the police that he wanted to tell what had happened, but he wanted to first speak to an attorney. The detective let Rice use the telephone to contact Seattle attorney, William Lanning, who arrived a short time thereafter. Rice conferred with Lanning for about an hour and a half, after which time Lanning gave the police a statement that Rice had signed, indicating that Rice wanted to talk to the police even though he knew that any statements could be used against him.[2]

In a tape–recorded interview with two detectives, Rice confessed that he was the Goldmarks' assailant. In that confession, he described the motivations behind his acts, the extent of his preparations, and the manner in which he completed his murders.

As to motivation, Rice stated that his financial situation had been deteriorating prior to the murders, a situation he hoped to alleviate by robbing the Goldmarks. He had lost his job more than 1 year earlier, was getting deeper in debt, and had been staying at the apartment of Anne Davis at various times since August.[3] When Davis left for Christmas

---

[2]The full text of the statement reads as follows:

"I, David Lewis Rice, hereby acknowledge that I have consulted with Bill Lanning in an attorney–client relationship, that he has advised me that any statement I give the authorities can and probably will be used against me; That I will probably be charged with aggravated 1st degree murder which may and probably will result in the death penalty being imposed.

"Notwithstanding this advice it is my intention to give a full and complete statement to the authorities."

[3]Rice was in love with Anne Davis and wanted her to marry him. At the time, however, Davis wanted them to be just friends.

vacation, she allowed Rice to stay in her apartment and she left him some food and a small amount of money to help him get by, but said that he had to be out of the apartment by the time she returned. While she was gone, he pawned her television for $10. Rice stated that he faced "terminal unemployment", his unemployment compensation had run out 4 or 5 months earlier, and he had "no place [to] turn to". He indicated that his financial situation was the reason why he acted on the day he did.

Rice also spoke of a political motivation for his crimes, based on his mistaken belief that Charles Goldmark belonged to the local Communist Party. Rice stated that he hoped to force Goldmark to give him information about other local Communists. In later interviews, he revealed that his intent was to work his way up the ladder of what he perceived to be a Communist conspiracy to take over the country.

Rice stated that both his political beliefs and his financial situation motivated his acts. He later estimated that his motivations on Christmas Eve were 50 percent financial and 50 percent a desire to gain information.

In his confession, Rice detailed the extent of his preparations. He indicated that he had been planning to kill Charles and Annie Goldmark for approximately 6 months, and that this was his primary intent on the day of the murders. He had not planned on killing any children. He did not expect any children to be present and would not have gone to their house if he had known any would be there. Nevertheless, he felt he had to kill the entire family once they had seen him.

Three separate times he attempted to get a look at the Goldmarks and their house. On approximately November 1, Rice had traveled to the Goldmarks' neighborhood to "see what kind of house it was and just to check out the neighborhood." On that trip, Rice did not see anybody at the Goldmark house and "wasn't absolutely positive" that they even lived there. At this point, Rice did not even know what Charles and Annie Goldmark looked like. One week

later, Rice visited Charles Goldmark's office building, apparently in an attempt to determine what he looked like. This attempt, too, was unsuccessful. Finally, Rice returned to the Goldmark residence in the first week of December in order to confirm that they lived there, but again nobody appeared to be home.[4]

Rice's preparations included ensuring that he had the means to complete his mission. He purchased an M–1 rifle to use on the Goldmarks, but later decided against using it because of its noise and bulk. He also purchased two pairs of handcuffs, a toy gun and a small quantity of chloroform. At one point, he tested the chloroform on himself in order to learn how long its effects could be expected to last.

Rice's confession also covered the manner in which he committed the murders. He gained entry to the Goldmark residence by posing as a taxi cab driver who had a package to deliver. Before arriving at their house, he mistakenly knocked on the door of their next–door neighbor. Upon discovering his error, he proceeded to the correct house. One of the Goldmark boys answered the door and called his father to receive the package. When Charles Goldmark reached the door, Rice quickly displayed what later turned out to be the toy gun and entered the house. He then gathered the entire family upstairs in the master bedroom. Charles Goldmark showed Rice the $14 he had on his bedroom counter, and Rice took it. Rice also noticed a wallet lying there and removed a bank card from it. Charles Goldmark gave him what later turned out to be a false access number for that card. Rice told the Goldmarks to lie face down on the floor and immobilized Charles and Annie by handcuffing their hands behind their backs. He stated that he did not need to immobilize the children. Despite

---

[4]Rice's preparations included investigating the residence of at least one other robbery target. Rice told the police that 1 month before he killed the Goldmarks, he had attempted to find the home of another Seattle attorney, who Rice considered to be a crook, but aborted that mission after being unable to find the house and after determining that the neighborhood was secure.

Rice's assertions that he intended to question the Gold-
marks about the activities of the local Communist Party,
there is no indication that he ever did so; apparently, he
discussed only his need for money.

As Rice was about to render his victims unconscious by
using chloroform, Charles Goldmark told him that they
were expecting guests to arrive at their house at 7:30 p.m.
Rice proceeded with the chloroform, applying it first to
Charles, then to Annie, and finally to the children. Annie
Goldmark struggled slightly at the bad smell. At this point,
it was approximately 7:15 p.m. and Rice realized that he
had only a few minutes before guests might arrive. He
began searching the house for household objects with which
he could kill his victims. He first found a fillet knife with a
12-inch blade in a kitchen drawer. He continued looking
and eventually found a steam iron in a basement storage
area. The search took only 4 to 5 minutes. He returned to
the master bedroom, taking with him the iron and the
knife.

Rice began methodically bludgeoning the unconscious
victims with the pointed end of the iron. He started with
Charles Goldmark, striking him four or five times in the
back of the head. He then struck Annie Goldmark on the
side of her head in the same manner, causing her to start
moving. Rice then hit her "a couple more times" and she
stopped moving. He turned to the children next, hitting the
first boy five or six times and the second boy approximately
four times in the same manner. Rice returned to the
father's body and checked the arteries in his neck to see if
his pulse was still beating. He found that both Charles and
Annie still had signs of life, so he "decided to complete the
job with the knife". Turning to Charles, Rice inserted the
point of the knife some 5 inches into the skull fracture he
had just inflicted with the iron. The knife went in until it
was hitting the opposite side of the skull, at which point
Rice "kind of stirred it around." In the same manner, he
stirred the knife in the brains of the children. Not finding a

similar opening in Annie's skull, he stabbed her in the chest and again stirred the knife around.

Throughout the attacks, Rice was wearing gloves. After he had finished knifing the victims, he noticed that his gloves and clothing had been splattered with blood. He wiped off some of the blood and removed his gloves. He left behind the murder weapons and the handcuffs. As he was leaving the house, he turned off the lights. He took with him keys to the Goldmarks' car, but he was unable to get into the garage to take it.

Rice left the Goldmarks' neighborhood. He walked to a nearby cash machine and attempted to use Charles Goldmark's bank card, but was unable to withdraw any money. A bank camera recorded Rice's picture at that location between 7:34 and 7:38 p.m. He began walking toward Anne Davis' apartment, but on the way realized that he had left the handcuffs in the Goldmark house. He believed that he might have left some fingerprints on the cuffs and decided to retrieve them. He first proceeded, however, to the apartment, changed some of his clothing, and then took a taxi to a point near the Goldmarks' neighborhood. He began walking toward their home, and as he got closer he heard police radios and saw that the house lights had been turned on. He considered himself all but caught because of the fingerprints he thought he had left on the handcuffs before he put on his gloves.[5] He left the area on foot and threw away the car keys, the bank card, and the slip of paper with the identification code into some ivy a few blocks from the Goldmark residence.

Throughout this confession, Rice gave detailed descriptions of various physical objects in terms of compass headings. For example, he described in this manner the location of the Goldmark residence, the physical layout of the house itself, and the location of various objects within the house.

---

[5]In fact, however, the police could not find any identifiable fingerprints of Rice on the handcuffs.

The police later confirmed these descriptions as being "completely accurate."

On December 26, the police searched Anne Davis' apartment and storage area and found many items of incriminating evidence to corroborate Rice's statements. They found, among other items, the toy gun, a bottle of chloroform, and the clothing he wore during the murders, including the pair of cloth gloves. Also of considerable interest were a number of materials that appeared to have been written by Rice, a fact that was confirmed by later handwriting analysis. A notebook was found in which Rice had written the addresses of the Goldmark residence and the office building where Charles worked as an attorney. On this page, Rice included directions on how to get to the Goldmark house by bus. On another page he had written an extended list entitled, "Basic Armament for One Man Mission". Included in this list were such items as a knife, grappling hook, guns, garrotte, tear gas grenades, plastic explosives and 2 days of rations. On a third page, Rice had written a series of comments concerning military preparedness, such as "I must be mobile & fluid, so that, if I am attacked, I can retreat, or counter–attack, whichever I deem suitable", and "I must have the ability to attack any target, regardless of size & capability. This includes weapons, knowledge, physical & mental stamina, and logistics."

Also found in Davis' apartment was a separate piece of paper on which Rice had written in part the following list:

Get knife
Find out what kind of legal svcs. [crossed out]
Find out what he looks like [crossed out]
When does he leave office
Does he drive
What kind of car
Set up time to be there [crossed out]
[the name and address of another Seattle attorney]

Another document written by Rice described how the country should be divided into five regions, each to have reactionary forces ready to repel the enemy's "grand finale"

attack. According to this document, the enemy's plan was to be carried out by 1990. Therefore, resistance had to be at least partially in place by 1986.

Finally, the police discovered letters Rice had written to Anne Davis. These letters corroborate Rice's statements that he had both political and financial motivations behind his attack on the Goldmarks. One of these letters read,

> Dear Annie,
>
> I am writing this in hopes that you will understand why I have decided to take a step into the "dark side".
>
> Evil is a very powerful force. A long time ago, the mere mention of God was enough to send Satan scurrying for cover. This is not so, anymore. This is Satans world, now. And, it's going to take more than just words to break him.
>
> It is going to take an assault on his empire, so strong, and so quick that he won't have the resources to recover

Another letter contained the following paragraph:

> I just wish I could have helped you with some of your problems, such as money. Believe me, I was trying, desperately, to fix that for you. I finally decided that I would either do it, or, die trying. You know the outcome.

On December 28, Anne Davis returned to Seattle from her vacation. The police questioned her 2 days later and then offered to allow her to talk to Rice if a policeman were present. She agreed. The police received permission from defense counsel for the meeting to be conducted in this manner. Davis and Rice talked for approximately 10 minutes. According to the police officer, when Davis asked Rice why he had done what he did, Rice responded, "For the money." More than once she asked why he had attacked the children in particular, and he answered, "I was in it too far, I had to do it, they could identify me."

Rice also told the police during this same general time period that Anne Davis had been a good influence on his life, and in so doing, he stated that his choice of Communism as a target was to a certain extent a matter of chance. In the words of the detective, "[H]e stated to me if it had not been for Anne Davis, he probably would have done

something earlier and that something might not have been the Goldmarks, it might not have even been Communism, but it just turned out to be Communism."

Rice was charged with four counts of aggravated first degree murder and the prosecutor gave notice that he would be seeking the death penalty. Rice entered a general plea of not guilty as well as a plea of not guilty by reason of insanity. According to defense counsel, however, there was "no question about [Rice's] competency to stand trial." The trial was bifurcated into guilt and penalty phases. In the guilt phase, the defense did not contest the fact that Rice had killed the Goldmarks, but attempted to prove that he was insane at the time of the murders.[6]

Although most of the issues Rice raises in this appeal only tangentially implicate the psychiatric evidence used or available at trial, a review of that evidence is necessary to complete the picture, especially in view of the penalty imposed here.

The defense argued in two separate ways that Rice was insane at the time of the murders. First, defense counsel elicited testimony from a variety of witnesses, including Anne Davis, establishing some of Rice's unorthodox views. For example, Rice believed that a nuclear war was pending. He wanted to build an underground shelter in Colorado, big enough to house hundreds of people for a number of years until the radiation died down, so that he could emerge with the others and help create a new society. Rice also believed that he had a black box in his head into which he put problems he could not solve. There was also evidence that Rice believed that extraterrestrial beings gave him guidance

---

[6]In Washington, a criminal defendant has the burden of proving insanity by a preponderance of the evidence. RCW 9A.12.010(2); *State v. Box,* 109 Wn.2d 320, 745 P.2d 23 (1987).

The defense also argued to the jury that there was a lack of premeditation. However, by finding Rice guilty of first degree murder, the jury concluded that this element had been satisfied. Rice has not argued on appeal that there was insufficient evidence for the jury to reach this conclusion. Thus, we need not address the facts of this issue.

in choosing his actions, such as by furnishing him with the specifications for building the underground shelter.

The defense showed the jury a videotaped interview of Rice held on March 27, 1986, some 3 months after the murders took place. The interview was conducted by Sam Keen, an author in the area of psychology, but not himself a clinical psychologist.[7] In that interview, Rice talked about his self–appointed mission to prevent Communist and banking conspiracies from taking over the country. He stated that enemy troops were poised at America's borders ready to attack and that, in fact, Arizona had already been invaded once. He discussed his belief that he was insane at the time of the murders because his mind had "shut down", a condition that he periodically experienced when he could not answer certain questions about the world or himself. Rice also claimed that he was much more suggestible whenever he experienced that condition, and that he killed the family because Annie Goldmark at one point said, "He is going to kill us."[8] Finally, Rice said that he was in a war against evil, that killing the Goldmarks was the lesser of two evils, and that "sometimes soldiers have to kill and die". The defense argued to the jury that any person who held all these beliefs had to be insane.

The defense next contended that Rice was insane under the *M'Naghten* test for insanity. This test provides that a person is insane if:

---

[7]The defense attempted to have Sam Keen give the jury his opinion as to Rice's sanity at the time of the murders, but the trial court ruled that he was insufficiently qualified as an expert to testify on that issue. After this ruling, the defense made an offer of proof on this question outside the jury's presence. Keen stated that in his opinion, Rice did not understand the nature and quality of his acts on the day of the murders, because he thought it was right to kill what he considered to be the enemy. Keen admitted, however, that his opinion was not based on psychological test data.

[8]At trial, Sam Keen dismissed as "ludicrous" Rice's idea that Annie Goldmark's statement caused him to kill the family. Additionally, Dr. Kenneth Muscatel, a clinical psychologist, rejected "absolutely" this theory as a psychological explanation of Rice's actions.

> At the time of the commission of the offense, as a result of mental disease or defect, the mind of the actor was affected to such an extent that:
> (a) He was unable to perceive the nature and quality of the act with which he is charged; or
> (b) He was unable to tell right from wrong with reference to the particular act charged.

RCW 9A.12.010(1). The defense argued that Rice met the second prong of this test, because even though he knew that killing was wrong in general, he felt that killing the Goldmarks was the lesser of two evils. The defense contended that in Rice's war against evil, his mental illness prevented him from being able to distinguish right from wrong.

The State countered this evidence by presenting a battery of test results relevant to the insanity issue. Michael Morrison, a member of the King County Jail psychiatric staff, testified about the Minnesota Multiphasic Personality Inventory (MMPI) that he administered to Rice 2 days after his arrest. The results of this test were "consistent with more a character disorder rather than a psychotic process. A person with that profile would be cold, distant, not very empathetic, self–centered. But it was pretty unremarkable, other than that."

Other tests were conducted by, or at the request of, Dr. Kenneth Muscatel, a clinical psychologist appointed by the trial court on January 2 to investigate Rice's competency, a step that was requested by the defense. Dr. Muscatel conducted a Trail–Making Test designed to uncover whether organic problems existed in the brain. This test revealed no organic brain problems. Additionally, Dr. John Mullins, a neurologist, conducted a "complete general physical and neurological examination" of Rice and found "normal" results. Specifically, he concluded that Rice had "no evidence of any organic central nervous system disease or intracranial abnormalities." A test for intelligence, the Wechsler Adult Intelligence Scale, showed Rice possessed

"a normal or perhaps high average intelligence." A Rorschach test, requiring the subject to describe what he sees in various ink blots, revealed that Rice had a "deep personality disorder and a disordered childhood", but disclosed no inference of psychotic thinking.

At trial, Dr. Muscatel testified that in his opinion Rice was legally sane at the time of the murders.[9] He based his opinion on many factors, including the test results discussed above, certain materials given to him by counsel, interviews he conducted with four of Rice's family members, and nine interviews with Rice himself in January, February, and May 1986. Although he characterized Rice as "extremely disturbed", having "schizoid and paranoid features", he determined that Rice was neither psychotic nor a paranoid schizophrenic.

Dr. Muscatel decided that Rice did not qualify as insane under either prong of the *M'Naghten* test. As to the first prong, he concluded that Rice knew the nature and quality of his acts. Dr. Muscatel pointed out that Rice "committed a crime that was planned and enacted with a high degree of organization, awareness, and cognizance." He noted the extent of Rice's preparations and the "full awareness and deliberation" with which he murdered his victims. Dr. Muscatel concluded that there was "no evidence of substantial confusion or severe disorganization, either in the behavior leading up to, during, or after the crime."

Dr. Muscatel also concluded that Rice did not qualify as insane under the second *M'Naghten* prong, although this question was closer. According to Dr. Muscatel, even though Rice had "difficulty" in distinguishing right from wrong on the night of the murders, he was capable of doing

---

[9]Only one other witness, Anne Davis, testified on this issue. She stated that in her opinion Rice was unable to tell the difference between right and wrong or to know the quality of his acts on the night of the murders. This testimony, however, did not represent an expert opinion, in that it was based on her personal knowledge of the defendant rather than on a professional examination. No objection was raised when Davis stated her opinion, thus the trial judge did not have an opportunity to rule on its admissibility.

so. Rice's difficulty stemmed from his stated belief that he was justified in what he was doing, considering himself to be in a war against evil. Dr. Muscatel did not consider this sufficient to render Rice incapable of telling right from wrong for a number of reasons.

First, he noted that although Rice's ideas as to his mission in fighting evil were at first glance "delusional, idiosyncratic, and psychotically base[d]", on closer examination they turned out to be ideas that he had learned from various right–wing groups and individuals with whom he associated, including Anne Davis.[10] Therefore, his belief system, with the exception of the extraterrestrial communication, was not truly delusional at all, but rather represented ideas shared by those around him.

Second, Rice knew that killing was wrong in general, and that even if he felt that he was justified in killing the Goldmark parents, he did not feel a similar justification in killing the children. Thus, at least with respect to the children, Rice was capable of distinguishing right from wrong.

Finally, Dr. Muscatel also pointed out the many ways in which Rice's attempts to conceal his activity showed that he knew that society considered these killings to be wrong and against the law. For example, Rice used gloves to avoid leaving fingerprints, he threw away the bank card and car keys when he realized that the bodies had been discovered, and he took care to wipe blood from his clothing and to turn out the lights before he left the house. Additionally, Rice wrote letters in which he acknowledged that his acts were criminal in nature. For all these reasons, Dr. Muscatel concluded that Rice was capable of telling right from wrong.

---

[10]Many of Rice's views concerning Communist and banking conspiracies came from individuals who were involved in Seattle's "Duck Club", a political discussion group concerned about perceived encroachments on the people's constitutional right to control their government. According to Dr. Muscatel, Rice's decision to uncover this conspiracy by violent means, however, was his own and apparently did not reflect the views of those around him, although Rice seemed to think that they would approve of his actions after the fact.

As to Rice's extraterrestrial communications, Dr. Muscatel testified that Rice described them not so much as spoken words, but as "urges" to follow certain laid-out paths. According to Dr. Muscatel, Rice at no time felt compelled to follow these urges, telling Dr. Muscatel that "I could follow them or not follow them, though if I didn't follow them, bad things tended to happen. If I did follow them, good things tended to happen."

In its refutation of Rice's insanity arguments, the State pointed out that Rice's characterization of his health changed between late December, when he was arrested, and January, when the doctors began examining him. The State's contention was that Rice had time during his incarceration to fabricate evidence of mental disease to bolster his insanity plea. For illustrative purposes, the prosecutor showed the jury the many inconsistencies between Rice's responses to the MMPI, administered only 4 days after the murders, and his characterization of his mental health to the neurologist on January 27. Various symptoms Rice denied experiencing in the MMPI test appeared for the first time when he was examined by Dr. Mullins.

In its closing argument to the jury, the State emphasized the importance of these inconsistencies by pointing to two further facts. First, Rice's characterization of his mental state on the day of the murders underwent a similar change during this time period. For example, in the March 1986 interview with Sam Keen, he mentioned his mind shutting down and a high degree of suggestibility, whereas at the time of his confession, no such indications were made. Doctor Muscatel attributed this change in focus to the process of rerationalization that Rice underwent in the months following the murders. Moreover, as time went on, Rice's statements about his motivations similarly downplayed his premeditated intent to kill the Goldmarks, focusing instead on his desire to gain information from his victims. Second, Dr. Muscatel testified that as a general rule, greater reliability is to be attached to statements made close in time to the actual events in question than is attached to later

statements. Accordingly, it was proper to place greater weight on statements that Rice made in his confession (December 26) and on his answers to the MMPI questions (December 28) than on Rice's subsequent statements, with their increased allegations of mental instability.

Although he was not called at trial, Dr. Christian Harris, a Seattle psychiatrist, was prepared to testify that Rice was sane at the time of the murders. After examining the defendant on three occasions and after viewing the Sam Keen videotape, Dr. Harris concluded that Rice was "quite capable" of knowing the nature and quality of his acts and of telling right from wrong.

The jury rejected Rice's insanity defense and found him guilty on all four counts of aggravated first degree murder. The jury found three aggravating factors as to each count: the murders were committed to conceal the commission of a crime, they were part of a common scheme or plan to murder more than one victim, and they were committed in the course of, or furtherance of, a robbery or burglary.

Following this verdict, the death penalty phase of the trial began before the same jury. The State presented no additional evidence in this phase. The defense called four of Rice's relatives, all of whom testified that they loved him and that he did not have a history of violent acts. In addition, Randy Rice, one of David's older brothers, testified that as a child David was physically and mentally abused by his brothers.

The jury's duty during its deliberations was to answer the following question: "Having in mind the crime of which the defendant has been found guilty, are you convinced beyond a reasonable doubt that there are not sufficient mitigating circumstances to merit leniency?" While the jurors were deliberating on this question, they requested that Rice's confession tape be replayed. After consulting with counsel, but apparently without the knowledge of Rice himself, the trial court had the tape replayed for the jury, after the courtroom was cleared of everyone except the jury,

judge, court reporter, clerk and bailiff. Rice's attorneys did not object to this procedure and voluntarily waived both their presence and the defendant's.

The jury then resumed its deliberations. When the jury announced that it had reached a verdict, however, Rice was not available, having been taken to the hospital for medical treatment after ingesting a "tobacco substance". Hospital staff telephoned the judge and told him that although Rice's vital signs were stable, he was unresponsive to communication, and it would be at least 2 hours before he could be brought to the courtroom. Although it was not known at that time, this was a suicide attempt, and Rice would not have been able to return to the courtroom until many days later.

After all counsel agreed that the verdict could be returned in Rice's absence and after defense counsel waived Rice's right to be present, the jury announced its verdict that leniency was not merited. Accordingly, Rice was sentenced to death. He now brings the current appeal and statutorily mandated death sentence review.[11]

## Issues

## I

### Guilt Phase

#### A. "In Life" Photographs

The State offered four photographs of the Goldmark family. Each photograph showed a different member of the family "in life", that is, as they were before the murders. The defense objected to their admission, arguing that they were irrelevant and unfairly prejudicial to Rice because they would inflame the jury. The State contended that the photographs were relevant to prove the identity of the victims, one of the elements of the State's case. Rice's attorney offered to stipulate to the victims' identity in order to remove that issue from the case. The trial court, however, overruled the objection and admitted all four photographs.

---

[11]Rice's counsel on appeal did not represent him at trial.

Rice now claims that admission of these photographs was prejudicial error.

 The admissibility of victims' photographs "in life" is apparently an issue of first impression in Washington.[12] On many occasions, this court has addressed the admissibility of photos showing dead victims. The issues in those cases usually involve the photographs' relevance and whether the jury would be so affected by their gruesome nature that unfair prejudice to the defendant outweighs the photographs' probative value. *See, e.g., State v. Harris,* 106 Wn.2d 784, 791, 725 P.2d 975 (1986), *cert. denied,* 107 S. Ct. 1592 (1987). The admissibility of "in life" photographs triggers a similar analysis: Are the photos relevant under ER 401,[13] and if so, does unfair prejudice to the defendant substantially outweigh the photos' probative value under ER 403?[14]

As an initial matter, when an information alleges that named victims have been killed, as in the present case, the prosecution must prove the victims' identification. *See* 40 Am. Jur. 2d *Homicide* § 289 (1968). Therefore, any evidence tending to prove this identification is relevant under ER 401.

 Rice contends, however, that the photographs' relevancy was negated when he offered to stipulate to the identity of the victims. Contrary to this argument, however, the State is not automatically precluded from presenting its evidence on an issue merely because the defendant offers a

---

[12]It is not clear if *State v. Hunter,* 183 Wash. 143, 48 P.2d 262 (1935) involved a photograph taken in life or while dead.

[13]ER 401 provides:

"'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

[14]ER 403 provides:

"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

stipulation. The Court of Appeals has held that "a stipulation is an agreement between the parties to which there must be mutual assent." *State v. Adler,* 16 Wn. App. 459, 465, 558 P.2d 817 (1976); *see also State v. Tharp,* 27 Wn. App. 198, 208, 616 P.2d 693 (1980), *aff'd,* 96 Wn.2d 591, 637 P.2d 961 (1981). If the State does not agree to the stipulation, the issue remains open and the State can proceed to prove its case in the manner that it sees fit, subject to the restrictions of ER 403 and other rules of evidence. *Adler,* at 465; *State v. Crenshaw,* 98 Wn.2d 789, 807, 659 P.2d 488 (1983). Stated in a slightly different way, the State is not bound to stipulate to the defendant's offer unless unfair prejudice substantially outweighs the proffered evidence's relevance. *United States v. Ellison,* 793 F.2d 942, 949 (8th Cir.), *cert. denied,* 107 S. Ct. 415 (1986). This principle has been overwhelmingly adopted both in the federal circuits[15] and the state courts. *See generally* Annot., *Offer of Defendant in Criminal Case To Concede or Stipulate Fact, or His Admission of Same, as Affecting Prosecution's Right To Introduce Evidence Thereof,* 91 A.L.R. 1478 (1934) (and book of supplemental decisions). It is also supported by sound policy, in that the State should be allowed to present the complete picture to the jury. *See, e.g., Ellison,* 793 F.2d at 949. We join in adopting this rule. As a result, the "in life" photographs were relevant in the present case.

■ Turning to ER 403, Rice argues that, even if relevant, the photographs' value was substantially outweighed by unfair prejudice to the defendant. A trial court's decision in this area can be reviewed only for a manifest abuse

[15]*E.g., United States v. Ellison,* 793 F.2d 942, 949 (8th Cir.), *cert. denied,* 107 S. Ct. 415 (1986); *United States v. Davis,* 792 F.2d 1299, 1305 (5th Cir.), *cert. denied,* 107 S. Ct. 464 (1986); *United States v. Schwartz,* 790 F.2d 1059, 1061 (3d Cir. 1986); *United States v. Campbell,* 774 F.2d 354, 356–57 (9th Cir. 1985); *United States v. Chaimson,* 760 F.2d 798, 805–06 (7th Cir. 1985); *United States v. Pedroza,* 750 F.2d 187, 201 (2d Cir. 1984) (*but see United States v. Mohel,* 604 F.2d 748, 753–54 (2d Cir. 1979)); *United States v. O'Shea,* 724 F.2d 1514, 1516–17 (11th Cir. 1984); *United States v. Washington,* 705 F.2d 489, 498 (D.C. Cir. 1983); *United States v. Brinklow,* 560 F.2d 1003, 1006 (10th Cir. 1977), *cert. denied,* 434 U.S. 1047 (1978); *United States v. Burkhart,* 545 F.2d 14, 15 (6th Cir. 1976).

of discretion. *State v. Mak,* 105 Wn.2d 692, 702–03, 718 P.2d 407, *cert. denied,* 107 S. Ct. 599 (1986). An abuse of discretion exists only when no reasonable person would take the position adopted by the trial court. *State v. Huelett,* 92 Wn.2d 967, 969, 603 P.2d 1258 (1979). In this regard, we note that the general rule in other jurisdictions is that "in life" photographs are admissible despite their potential for inflaming the jury against the defendant. *See* 40 Am. Jur. 2d *Homicide* § 289 (1968); Annot., *Homicide: Identification of Victim as Person Named in Indictment or Information,* 86 A.L.R.2d 722, § 4[h] (1962). We conclude that the trial court did not abuse its discretion in admitting the photographs and this decision did not violate Rice's due process rights.

### B. Clothing Exhibits

The trial court admitted into evidence various blood-stained items found at the scene of the crime, including two sweaters, a bathrobe, a shirt, eyeglasses, a handkerchief and a napkin. The judge overruled the defense's objection that the probative value of these exhibits was outweighed by their prejudicial effect. ER 403. As discussed above with respect to the "in life" photos, this determination is reviewable only for an abuse of discretion.

Rice entered a plea of not guilty as well as a plea of not guilty by reason of insanity. As a result, the State was required to prove the elements of murder in addition to rebutting the insanity defense. *State v. Crenshaw,* 98 Wn.2d 789, 806, 659 P.2d 488 (1983). In murder cases, the general rule is that clothing worn by the victims at the time of the killings is admissible. *State v. Payne,* 25 Wn.2d 407, 413–14, 171 P.2d 227, 175 P.2d 494 (1946). This case is no exception. The bloodiness of these exhibits established the grievous nature of the victims' wounds. The exhibits also substantiated witnesses' testimony as to the scene of the crime by "tend[ing] to illustrate and make more definite the oral evidence." *State v. Wheeler,* 74 Wn.2d 289, 293, 444 P.2d 687 (1968). In addition, these exhibits laid the

foundation for the expert witnesses' testimony as to the cause of the Goldmarks' deaths. *See State v. Music,* 79 Wn.2d 699, 712, 489 P.2d 159 (1971), *vacated as to imposition of death penalty,* 408 U.S. 940 (1972). Accordingly, the evidence was relevant.

■ Nor was the probative value of these exhibits substantially outweighed by unfair prejudice to the defendant. Competent evidence is not prejudicial merely because it is gruesome. *Crenshaw,* at 806; *State v. Farley,* 48 Wn.2d 11, 19, 290 P.2d 987 (1955), *cert. denied,* 352 U.S. 858 (1956). Moreover, this court has held that the admission of far more gruesome and inflammatory evidence was not an abuse of the trial court's discretion. *See Crenshaw,* at 806 (five photographs of a decapitated body). We find no abuse of discretion and no violation of Rice's due process rights here.

### C. Statement of Law in Closing Argument

In his closing argument in the guilt phase, the prosecutor told the jury that "legal [insanity] requires that the defendant has lost contact with reality so completely that he is beyond any of the influences of the criminal law."

Rice contends that this argument was improper because it misstated the law set out in the judge's instructions to the jury and deprived him of his constitutional right to a fair trial. The State asserts that this argument was a correct statement of the law because it consisted of a direct quotation from language in some of this court's opinions. We have indeed stated that the insanity defense "is available only to those persons who have lost contact with reality so completely that they are beyond any of the influences of the criminal law." *State v. White,* 60 Wn.2d 551, 590, 374 P.2d 942 (1962), *cert. denied,* 375 U.S. 883 (1963), *quoted in Crenshaw,* at 797, *and in State v. McDonald,* 89 Wn.2d 256, 272, 571 P.2d 930 (1977). Therefore, the prosecutor did not misstate the law of this state.

Nevertheless, the prosecutor's argument was improper. Any statements to the jury as to the law are to be confined

to the law set forth in the jury instructions. *State v. Mak,* 105 Wn.2d 692, 726, 718 P.2d 407, *cert. denied,* 107 S. Ct. 599 (1986); *State v. Davenport,* 100 Wn.2d 757, 760–61, 675 P.2d 1213 (1984). The only law on insanity the judge gave to the jury was the pattern instruction based on the *M'Naghten* test.[16] The prosecutor's argument exceeded the law of that instruction.

■ However, Rice has the burden of proving not only the impropriety of this argument but also its prejudicial effect. *Mak,* at 726. To do so, he must show that "there is a substantial likelihood that the alleged misconduct affected the jury's verdict thereby depriving the defendant of a fair trial." *Mak,* at 726. We find that no such likelihood existed here for three reasons. First, as noted above, the argument did not misstate the law. Second, the prosecutor did not dwell on this point beyond the one statement quoted above. Third, the jury was instructed to disregard any argument that was not supported by the law given to the jury by the judge. Accordingly, the prosecutor's argument did not amount to reversible error.

D. Instructions on "Intent" and "Premeditation"

Instruction 5 in the guilt phase informed the jury that "[a] person commits the crime of murder in the first degree when, with a *premeditated intent* to cause the death of another person, he or she causes the death of such person or of a third person." (Italics ours.)

The trial court defined "intent" in instruction 10 by using Washington Pattern Jury Instructions (Criminal) (WPIC) 10.01: "A person acts with intent or intentionally when acting with the objective or purpose to accomplish a

---

[16]That instruction reads in pertinent part as follows: "For a defendant to be found not guilty by reason of insanity you must find that, as a result of mental disease or defect, the defendant's mind was affected to such an extent that the defendant was unable to perceive the nature and quality of the acts with which the defendant is charged or was unable to tell right from wrong with reference to the particular acts with which the defendant is charged." *See also* RCW 9A.12.010 (codification of *M'Naghten* test).

result which constitutes a crime." This language is derived from RCW 9A.08.010(1)(a).

The trial court defined "premeditated" in instruction 11 by using a portion of WPIC 26.01:

Premeditated means thought over beforehand. When a person, after any deliberation, forms an intent to take human life, the killing may follow immediately after the formation of the settled purpose and it will still be premeditated. Premeditation must involve more than a moment in point of time. The law requires some time, however long or short, in which a design to kill is deliberately formed.

Rice proposed instead the following instruction based on language in *State v. Brooks,* 97 Wn.2d 873, 651 P.2d 217 (1982):

The terms "intent" and "premeditation" are not synonymous. They are separate and distinct elements of the crime of murder in the first degree.

"Intent" involves the mental state of acting with the objective or purpose to accomplish a result which constitutes a crime.

On the other hand, the term "premeditate" encompasses the mental process of thinking before hand, deliberation, reflection, weighing or reasoning for a period of time, however short. Thus, the objective or purpose to take human life (sufficient to support a charge of second degree murder) must have been formed after some period of deliberation, reflection or weighing in the mind for the act to constitute first degree murder.

■ Jury instructions are sufficient if they permit each party to argue his theory of the case, are not misleading, and when read as a whole, properly inform the trier of fact of the applicable law. *State v. Mark,* 94 Wn.2d 520, 526, 618 P.2d 73 (1980); *State v. Foster,* 91 Wn.2d 466, 480, 589 P.2d 789 (1979). Moreover, a specific instruction need not be given when a more general instruction adequately explains the law and enables the parties to argue their theories of the case. *State v. Stone,* 24 Wn. App. 270, 273, 600 P.2d 677 (1979).

The judge's instructions were more than sufficient in covering this point of law. The proposed instruction was more specific in making clear that "intent" is not synonymous with "premeditation", but the instructions given by the judge, when read as a whole, made this abundantly clear. No error was committed in using the WPIC instructions instead of Rice's proposed instruction, and similarly there was no violation of his constitutional rights.

### E. Proposed Instruction as to Deific Commands

In the guilt phase, the trial court gave the standard instruction on insanity, WPIC 20.01, incorporating the *M'Naghten* test. The pertinent part of that instruction is set out at footnote 16 above. At trial, Rice challenged the sufficiency of this general instruction and proposed that the following instruction on deific commands be added:

> One who believes that he is acting under the direct command of God is no less insane because he nevertheless knows murder is prohibited by the laws of man.

This language is taken directly from this court's opinion in *State v. Cameron,* 100 Wn.2d 520, 526–27, 674 P.2d 650 (1983).

At trial, Rice argued that this instruction was supported by evidence in the record. He pointed to the letter Rice wrote referring to a battle with Satan and a passage in the videotaped interview with Sam Keen where he mentioned being an emissary of God. Also, in closing argument, defense counsel suggested that the extraterrestrial communications—or "urges"—were examples of deific commands. On appeal, Rice has not pointed to any other evidence in support of this argument.

■ The trial court did not err in rejecting Rice's proposed instruction. *Cameron* and other cases in this state make clear that a defendant following deific commands qualifies as insane only if his free will has been subsumed by his belief in the deific decree. *Cameron,* at 527; *State v. Crenshaw,* 98 Wn.2d 789, 798, 659 P.2d 488 (1983); *State v. Anderson,* 44 Wn. App. 644, 647, 723 P.2d 464, *review*

*granted,* 107 Wn.2d 1013 (1986), *dismissed as moot,* 109 Wn.2d 1015 (1987). In the present case, however, there was no such showing. Indeed, the only evidence presented was to the contrary. Dr. Muscatel testified that Rice by no means felt compelled to follow his urges. Indeed, he testified that Rice told him the following: "I could follow [the urges] or not follow them, though if I didn't follow them, bad things tended to happen. If I did follow them, good things tended to happen."

■ A party is entitled to an instruction on his theory of the case only if there is substantial evidence in the record to support that theory. *Cooper's Mobile Homes, Inc. v. Simmons,* 94 Wn.2d 321, 327, 617 P.2d 415 (1980); *State v. Quinn,* 43 Wn. App. 696, 704, 719 P.2d 936, *review denied,* 105 Wn.2d 1020 (1986). Because this standard has not been met in this case, Rice's proposed instruction was properly rejected.

## II
### PENALTY PHASE
### A. Emotional Nature of Closing Argument

On appeal, Rice contends that the prosecutor's closing argument to the jury in the penalty phase was an improper appeal to passion and prejudice. In particular, Rice points to two passages, the first of which reads:

> The fact that two of these victims were children, a ten–year–old boy and a twelve–year–old boy, was irrelevant to Phase 1. It now becomes something for you to consider in Phase 2. The fact that the family was killed in their own home on Christmas Eve was irrelevant to Phase 1. It was not an element of the crime, but it is a part of this crime and a part of what makes this crime one of those very few crimes that screams out for the death penalty as the only acceptable punishment.

Rice also challenges the following part of the prosecutor's closing argument:

> Put yourself, if you will, in the shoes of those two children who have been gathered in their parents' bedroom with a man who they believe has got a gun. And as they're told to lay down on the floor face down in their

parents' bedroom, they comply. And it's starting to come to Derek and Colin that whatever child believes that their parents can protect them from anything, especially in their own home, is not true. And as Derek and Colin hear the click of the handcuffs fastening around the wrists of their father and the click of the handcuffs as they're gathering around the wrists of their mother, what are they thinking? And as the defendant comes closer to them and cinches the sweaters up tight. These are factors that you should consider in having in mind the crime. Then the defendant going with the chloroform, first to Dad. And there is no indication that there was any words or struggle at that point. Then to the mother, who struggled at the nasty smell that the defendant talked about. And then finally to the point where that nasty smell of chloroform is coming closer to their faces. And their last conscious thoughts on this earth are the terror in that bedroom. That is the crime that the defendant committed. That is the crime that you have to have in mind when you weigh whether the State has convinced you beyond a reasonable doubt that the mitigating circumstances, the so-called mitigating circumstances merit leniency.

■ Rice contends that these remarks constituted a direct appeal to passion and prejudice and denied him a fair trial. The law in Washington in criminal cases is that "[a]lthough reference to the heinous nature of a crime and its effect on the victim can be proper argument, the prosecutor's duty is to ensure a verdict free of prejudice and based on reason." (Citations omitted.) *State v. Claflin,* 38 Wn. App. 847, 849–50, 690 P.2d 1186 (1984), *review denied,* 103 Wn.2d 1014 (1985).[17] Sometimes, however, the very nature of the crime renders its narration an emotional event. "A prosecutor is not muted because the acts committed arouse natural indignation." *State v. Fleetwood,* 75

[17]In a recent civil action, we disallowed use of a similar "golden rule" argument. *Adkins v. Aluminum Co. of Am.,* 110 Wn.2d 128, 139–43, 750 P.2d 1257 (1988). For many of the reasons set forth below, however, the considerations in a civil case and those in a criminal case, especially a death penalty hearing, are substantially different.

Wn.2d 80, 84, 448 P.2d 502 (1968). In death penalty hearings, the fact finder's task is to answer the following question: "'*Having in mind the crime of which the defendant has been found guilty,* are you convinced beyond a reasonable doubt that there are not sufficient mitigating circumstances to merit leniency?'" (Italics ours.) RCW 10.95–.060(4). This question clearly contemplates that the jury must focus on the circumstances of the crime itself. *See also Booth v. Maryland,* ___ U.S. ___, 96 L. Ed. 2d 440, 448, 451 n.10, 107 S. Ct. 2529 (1987). As a general matter, then, these circumstances are properly included in the prosecutor's argument to the jury, subject to the caveats discussed below.

Appellate courts in this state have not decided the propriety of a prosecutor's argument asking jurors to place themselves in the role of the victims. Some courts elsewhere have concluded that such argument is improper, although not necessarily of such a degree as to require reversal, in trials other than the sentencing phase of a death penalty case. *See United States v. Gaspard,* 744 F.2d 438, 441 n.5 (5th Cir. 1984), *cert. denied,* 469 U.S. 1217 (1985); *State v. Sowards,* 147 Ariz. 185, 709 P.2d 542 (Ct. App. 1984), *remanded on other grounds,* 147 Ariz. 156, 709 P.2d 513 (1985); *People v. Fields,* 35 Cal. 3d 329, 673 P.2d 680, 197 Cal. Rptr. 803 (1983) (guilt phase of death penalty case), *cert. denied,* 469 U.S. 892 (1984). However, due to the unique nature of the sentencing phase of a death penalty case, we need not address the propriety of this argument in other types of criminal cases.

In the death penalty phase, the jury is not deciding an issue of guilt or innocence, but instead is deciding a sentencing issue. The jury does not decide if the elements of the crime are met, but rather weighs the nature of the criminal acts against any mitigating factors. The jury should be allowed to consider, as part of that analysis, the crime's impact on the victims, and argument on that topic is proper to the extent that it is restricted to the circumstances of the crime. *See Booth v. Maryland,* 107 S. Ct. at

2535 n.10; *Brooks v. Kemp,* 762 F.2d 1383, 1409 (11th Cir. 1985), *vacated and remanded,* 106 S. Ct. 3325 (1986), *reinstated,* 809 F.2d 700 (11th Cir.), *cert. denied,* 107 S. Ct. 3240 (1987). In this regard, we concur in the California Supreme Court's analysis of a similar invitation to the jury to place themselves in the shoes of a victim:

> [A]t the penalty phase the jury decides a question the resolution of which turns not only on the facts, but on the jury's moral assessment of those facts as they reflect on whether defendant should be put to death. It is not only appropriate, but necessary, that the jury weigh the sympathetic elements of defendant's background against those that may offend the conscience. In this process, one of the most significant considerations is the nature of the underlying crime. Hence assessment of the offense from the victim's viewpoint would appear germane to the task of sentencing.

(Citations omitted.) *People v. Haskett,* 30 Cal. 3d 841, 863–64, 640 P.2d 776, 180 Cal. Rptr. 640 (1982).

Of course, argument must also be restricted to the evidence presented in the case, so that prosecutors cannot bring in extrinsic matters. *See Claflin,* at 849–52. In the present case, the prosecutor restricted his argument to those circumstances of the crime for which evidence had been presented.

Additionally, even argument that is conducted on proper subjects may still be improper if it is presented in an inflammatory manner. *State v. Fleetwood,* 75 Wn.2d 80, 448 P.2d 502 (1968). In a similar context, the California Supreme Court addressed this issue as follows:

> [T]he jury must face its obligation soberly and rationally, and should not be given the impression that emotion may reign over reason. In each case, therefore, the trial court must strike a careful balance between the probative and the prejudicial. On the one hand, it should allow evidence and argument on emotional though relevant subjects that could provide legitimate reasons to sway the jury to show mercy or to impose the ultimate sanction. On the other hand, irrelevant information or inflammatory rhetoric

that diverts the jury's attention from its proper role or invites an irrational, purely subjective response should be curtailed.

We conclude that because of its obvious relevance to a moral assessment of the crime, the prosecution's invitation to the jurors to project themselves into the role of the surviving victim in this case was insufficiently inflammatory to justify reversal. Although the argument no doubt evoked an emotional response, that reaction is attributable more to the gruesome nature of the crime than to the perspective from which it was portrayed.

(Citations omitted.) *Haskett,* at 864. These conclusions apply equally to the present case.

Finally, Rice argues that the prosecutor's argument in the sentencing phase violated principles set out in *State v. Bartholomew,* 101 Wn.2d 631, 683 P.2d 1079 (1984). *Bartholomew* placed the following limits on the types of evidence a prosecutor can introduce in the sentencing phase of a death penalty trial: "[E]vidence of nonstatutory aggravating factors must be limited to defendant's criminal record, evidence that would have been admissible at the guilt phase, and evidence to rebut matters raised in mitigation by the defendant." *Bartholomew,* at 642. As an initial matter, we note that *Bartholomew* addressed only the admissibility of evidence, not the propriety of closing argument. Even if we were to extend *Bartholomew* beyond its express holding, however, we would conclude that the prosecutor's arguments were fully proper for two reasons. First, it is difficult to conceive of the circumstances of the murders as being a nonstatutory aggravating factor when the statute by its very terms requires the jury to "hav[e] in mind the crime of which the defendant has been found guilty". RCW 10.95.060(4). Second, even if the crime's circumstances were considered to be a nonstatutory aggravating factor, the prosecutor's argument, based only on facts that were admitted into evidence in the guilt phase, did not exceed the limits stated in *Bartholomew.*

## B. Instruction as to Sympathy

Rice challenges the introductory instruction given in the penalty phase, which reads as follows:

It is your duty to determine the facts in this case from the evidence produced in court. It also is your duty to accept the law from the court, regardless of what you personally believe the law is or ought to be. You are to apply the law to the facts and in this way decide the case.

The order in which these instructions are given has no significance as to their relative importance. The attorneys may properly discuss any specific instructions they think are particularly significant. You should consider the instructions as a whole and should not place undue emphasis on any particular instruction or part thereof.

The evidence you are to consider consists of testimony of the witnesses and the exhibits admitted into evidence, in phase one of this trial and during this special sentencing hearing. It has been my duty to rule on the admissibility of evidence. You must not concern yourselves with the reasons for these rulings. You will disregard any evidence which either was not admitted or which was stricken by the court.

In determining whether any proposition has been proved, you should consider all of the evidence introduced by all parties bearing on the question. Every party is entitled to the benefit of the evidence whether produced by that party or by another party.

You are the sole judges of the credibility of the witnesses and of what weight is to be given the testimony of each. In considering the testimony of any witness, you may take into account the opportunity and ability of the witness to observe, the witness' memory and manner while testifying, any interest, bias or prejudice the witness may have, the reasonableness of the testimony of the witness considered in light of all the evidence, and any other factors that bear on believability and weight.

Counsel's remarks, statements and arguments are intended to help you understand the evidence and apply the law. They are not evidence, however, and you should disregard any remark, statement or argument which is not supported by the evidence or the law as given to you by the court.

The lawyers have the right and the duty to make any objections which they deem appropriate. Such objections

should not influence you, and you should make no presumption because of objections by counsel.

The law does not permit me to comment on the evidence in any way and I have not intentionally done so. If it appears to you that I have so commented, during either the trial or the giving of these instructions, you must disregard such comment entirely.

This instruction is a modification of WPIC 1.02 that was discussed in *State v. Mak,* 105 Wn.2d 692, 750–51, 718 P.2d 407, *cert. denied,* 107 S. Ct. 599 (1986).[18] The only relevant modification made by the trial court in *Mak* and at trial here was the omission of the last four sentences of WPIC 1.02, which read as follows:

You have nothing whatever to do with the punishment to be inflicted in case of a violation of law. The fact that punishment may follow conviction cannot be considered by you except insofar as it may tend to make you careful.

You are officers of the court and must act impartially and with an earnest desire to determine and declare the proper verdict. Throughout your deliberations you will permit neither sympathy nor prejudice to influence you.

Rice argues that these omissions from WPIC 1.02 allowed the jury to consider sympathy for the victims in arriving at its verdict. The State responds that the instruction cannot be held to be erroneous, especially in light of the fact that both parties requested the instruction that was actually given.[19]

We begin our analysis by noting that it was proper for the trial court to omit the last four sentences of WPIC 1.02. It would be inappropriate, of course, to instruct jurors in the penalty phase that they have nothing to do with Rice's punishment. Even more important, had the trial court then

---

[18]*Mak* is not directly on point, however. Mak contended that the instruction precluded him from arguing that the jury could grant leniency based on sympathy for the defendant. *Mak,* at 754. Rice, on the other hand, is arguing that the instruction erroneously allows the jury to base its decision on sympathy for the victims.

[19]Even though Rice invited the very error to which he is now objecting, we will review his objection, this being a capital case. *See Mak,* at 749.

instructed the jury "you will permit neither sympathy nor prejudice to influence you", he would have created reversible error. Such an instruction would have improperly precluded the jury from considering sympathy for the defendant in its sentencing deliberations. *See State v. Quinlivan*, 81 Wn.2d 124, 129–30, 499 P.2d 1268, 72 A.L.R. 3d 835 (1972).

 Therefore, the only issue is if the trial court should have added a paragraph making clear that the jury should not allow sympathy for the victims to influence its sentencing decision. A sentence of death must be based on reason, not on emotions such as sympathy for the victims. *Bartholomew*, 101 Wn.2d at 638, construing *Gardner v. Florida*, 430 U.S. 349, 358–59, 51 L. Ed. 2d 393, 97 S. Ct. 1197 (1977). Because the introductory instruction in the penalty phase was silent as to the jury's use of sympathy, we must look to the other instructions in order to determine if the jury was adequately informed that a verdict not to grant Rice leniency must be based on reason, not emotion. In this regard, instruction 6 required jurors to impartially consider the evidence and instruction 2 required them to "fully, fairly and carefully" consider the evidence. Moreover, instruction 2 generally directed jurors to use reason in determining if the State satisfied its burden of proving that leniency was not merited.[20] Far from suggesting that the

---

[20]In its entirety, instruction 2 of the sentencing proceeding provided that:

"During this special sentencing proceeding, the State has the burden of proving to you beyond a reasonable doubt that there are not sufficient mitigating circumstances to merit leniency and that the death penalty should therefore be imposed.

"The defendant is presumed to merit leniency, that is a sentence of life in prison without possibility of parole. This presumption continues throughout the entire proceeding unless you find it has been overcome by the evidence beyond a reasonable doubt.

"A reasonable doubt is one for which a reason exists and may arise from the evidence or lack of evidence. It is such a doubt as would exist in the mind of a reasonable person after fully, fairly and carefully considering all of the evidence or lack of evidence. If, after such consideration, you have an abiding belief that there are not sufficient mitigating circumstances to merit leniency, you are satisfied beyond a reasonable doubt."

jury could allow sympathy for the Goldmarks to influence its verdict, these instructions adequately directed the jury on the importance of a reasoned decision.

## C. Replaying of Confession

During its penalty phase deliberations, the jury asked to rehear Rice's taped confession. The trial court summoned the attorneys to the courtroom to discuss the proper response. The judge postponed any decision until the following morning to allow the parties to research the issue and to allow the defense attorneys to talk to Rice. The next morning, the defense agreed with the State that the jury was entitled to rehear the tape and they did not object to that procedure. The defense indicated that through a mix-up in communication they had not asked Rice if he wanted to be present for these proceedings. Both the State and the defense attorneys were of the opinion that Rice's presence for the playing of the tape was not necessary. The judge decided that the best way to accommodate the jury's request was to replay the tape for them in the presence of himself, the bailiff, the court clerk, and the court reporter. All counsel waived the right to be present while the tape was replayed.

Rice now argues that he did not make a knowing and voluntary waiver of his right to be present. He contends that these procedures violated his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments and the parallel provisions of the state constitution.

This court has recently concluded that it is improper for a trial court, without prior notice to the defendant, to replay a tape for a deliberating jury in the defendant's absence. *State v. Caliguri*, 99 Wn.2d 501, 508, 664 P.2d 466 (1983). We stated that there should be no communication between the judge and the jury in the defendant's absence. Moreover, examination of the cases relied on in *Caliguri* shows that this error is one of constitutional dimensions, violating the defendant's right to appear and defend himself in person and by counsel. *See*

*State v. Shutzler,* 82 Wash. 365, 367–68, 144 P. 284 (1914); *State v. Wroth,* 15 Wash. 621, 623–24, 47 P. 106 (1896). In *Caliguri,* we concluded that such error is not conclusively prejudicial if a third party was present at the time of the communication. In such situations, error can be held harmless if the State proves that fact beyond a reasonable doubt. We held that the replaying of the tapes in *Caliguri* was harmless error, even though the proceedings were not recorded and even though portions of the tapes that had been excluded at trial were played for the jurors. *Caliguri,* at 505, 509.

Under these principles, the playing of Rice's confession tape was erroneous, but not of a degree requiring reversal. The proceeding was recorded by a court reporter, and nothing was replayed to the jurors that they had not heard earlier in the trial. Therefore, this is an even clearer case than *Caliguri* of harmless error. Rice's absence from this proceeding, when the courtroom had been cleared except for court personnel, did not prejudice his defense.

### D. Defendant's Presence at Verdict

The jury began its deliberations on the sentencing issue at 11:45 a.m. on June 9. At some time on the next day, Rice apparently ingested "a tobacco substance" in the King County Jail and had to be taken to Harborview Medical Center for treatment. The jail staff informed the trial court of this development at 1:40 p.m. on June 10. Twenty minutes later, the jury indicated to the bailiff that it had reached a verdict. Just before 3 p.m., the judge was informed that Harborview staff had indicated that Rice's vital signs were stable but that he was "unresponsive to communication". Harborview staff still had to pump Rice's stomach, and they estimated that it would be at least 2 hours before he could be brought to the courtroom. Although it was not known at that time, Rice's actions constituted an attempt at suicide.

The trial court then asked counsel for their positions on taking the verdict in Rice's absence. The defense stated

that Rice's appearance was not required and waived his presence. The judge found that the facts summarized above constituted "good cause" under CrR 3.4(a) for receiving the verdict in Rice's absence, and he proceeded to do so.

CrR 3.4(a) provides as follows:

*The defendant shall be present at* the arraignment, at every stage of the trial including the empaneling of the jury and *the return of the verdict,* and at the imposition of sentence, *except* as otherwise provided by these rules, or as excused or excluded by the court *for good cause shown.*

(Italics ours.)[21]

This rule recognizes that in the ordinary case a defendant should be present to receive the verdict, but that under circumstances constituting "good cause", the defendant's right to be present can be outweighed by other considerations. The rule does not, however, give any guidance as to what types of considerations qualify as "good cause". The trial court had no way of knowing exactly when Rice would be ready to appear in court. He was also faced with keeping a jury sequestered for an unknown period of time after what must have been an arduous deliberative process.

---

[21]Also pertinent to the discussion of this issue is CrR 3.4(b), although the parties have not cited it. That rule provides in relevant part as follows: "In prosecutions for offenses not punishable by death, the defendant's voluntary absence after the trial has commenced in his presence shall not prevent continuing the trial to and including the return of the verdict." This rule was adopted from former Federal Rule of Criminal Procedure 43. 4A L. Orland & D. Dowd, Wash. Prac., *Rules Practice* § 6212 (3d ed. 1983). Former rule 43 did not apply to "prosecutions punishable by death" because it was once thought that in a capital case a defendant could not waive his right to be present. *See* 3A C. Wright, *Federal Practice* § 723 (2d ed. 1982). However, the federal rule was amended in 1975 to remove the distinction between capital and noncapital cases. *See* Fed. R. Crim. P. 43. The federal rule was changed because of the Supreme Court's implication in *Illinois v. Allen,* 397 U.S. 337, 25 L. Ed. 2d 353, 90 S. Ct. 1057 (1970), that a defendant may be deemed to have waived his right to be present at trial, even in a capital case, when he disrupts the proceedings. See footnote 22. This development leads us to question the advisability of CrR 3.4(b)'s current distinction between capital and noncapital cases. Nevertheless, even accepting the rule as it is presently written, we conclude that reversible error was not committed. Any error here was harmless for the same reasons set out above with respect to CrR 3.4(a).

While it might have been preferable to delay the proceedings a short time to obtain an update on Rice's condition, we cannot say that the trial court erred in these circumstances, especially given counsel's waiver.

Nevertheless, if any error was committed here, it was harmless. Because we are dealing with a rule violation rather than a violation of the constitution, the "harmless beyond a reasonable doubt" standard discussed in the preceding section is inapplicable. Instead, such error "'is not prejudicial unless, within reasonable probabilities, had the error not occurred, the outcome of the trial would have been materially affected.'" *State v. Smith,* 106 Wn.2d 772, 780, 725 P.2d 951 (1986) (quoting *State v. Cunningham,* 93 Wn.2d 823, 831, 613 P.2d 1139 (1980)). The only way in which Rice's absence could have affected the trial outcome would be if one of the jurors, when polled, changed his mind upon seeing Rice once again. This result, although possible, is not "reasonably probable". The jurors were individually polled and they affirmed their verdict in the presence of defense counsel. There is nothing in the record which indicates that the result would have been any different had Rice been present. Therefore, any violation of CrR 3.4 was harmless.

We next address the question of Rice's absence as a possible violation of his constitutional rights. Under the Sixth and Fourteenth Amendments, a criminal defendant has the right to attend his trial. *See Snyder v. Massachusetts,* 291 U.S. 97, 105–08, 78 L. Ed. 674, 54 S. Ct. 330, 90 A.L.R. 575 (1934); *see also* Const. art. 1, §§ 3, 22. The United States Supreme Court has held that this right entitles a defendant to be present at every stage of his trial for which "his presence has a relation, reasonably substantial, to the fulness of his opportunity to defend against the charge." *Snyder,* at 105–06. Stated another way, due process requires that a defendant be allowed to be present "to the extent that a fair and just hearing would be thwarted by his absence", *Snyder,* at 108, but not "when presence would be useless, or the benefit but a shadow." *Snyder,* at 106–07. The Supreme

Court has recently reaffirmed these principles. *See Kentucky v. Stincer,* ___ U.S. ___, 96 L. Ed. 2d 631, 107 S. Ct. 2658, 2667 (1987); *United States v. Gagnon,* 470 U.S. 522, 527, 84 L. Ed. 2d 486, 105 S. Ct. 1482 (1985) (per curiam). The Court of Appeals in this state has also adopted this analysis. *State v. Jury,* 19 Wn. App. 256, 270, 576 P.2d 1302 (1978); *State v. Brown,* 29 Wn. App. 11, 16, 627 P.2d 132 (1981).

Under the *Snyder* standard, we conclude that Rice had a due process right to be present at the return of his verdict. Other courts have reached this same result. *See State v. Okumura,* 58 Hawaii 425, 570 P.2d 848 (1977); *Lee v. State,* 509 P.2d 1088, 1094 (Alaska 1973); *see also United States v. Friedman,* 593 F.2d 109, 121 (9th Cir. 1979) (using harmless error analysis, implying that an error was committed). *See generally* Annot., *Absence of Accused at Return of Verdict in Felony Case,* 23 A.L.R.2d 456, § 3 (1952) (and later case service).

The key question regarding Rice's absence at the return of verdict, however, is one of waiver. As an initial matter, before we decide if Rice's rights were waived, we must address whether the right can be waived in a death penalty case at all. For felony cases generally, a defendant in this state is capable of waiving his presence at trial, including the return of verdict, and the proceedings can validly continue in his absence. CrR 3.4; *State v. Washington,* 34 Wn. App. 410, 661 P.2d 605, *remanded,* 100 Wn.2d 1016 (1983), *rev'd on other grounds,* 36 Wn. App. 792 (1984). Despite the universal acceptance of this rule here and in other jurisdictions, *see* Annot., 23 A.L.R.2d 456, § 6 (and later case service), a split of authority exists as to the defendant's ability to waive his presence when the trial concerns a capital offense. *See* Annot., 23 A.L.R.2d 456, § 7 (and later case service). A slight majority of other courts hold that the right to attend the verdict in a capital case cannot be waived and that the defendant's absence is fatal error requiring reversal. The rationale generally given for this holding is that the defendant should be protected from

himself and that absolute fairness requires his presence. *See, e.g., Lee v. State,* 244 Ala. 401, 13 So. 2d 590 (1943).

We find this rationale unpersuasive. Its paternalistic assumptions about the incapacity of defendants to determine their own affairs are long outdated. Moreover, this rule would allow a defendant to indefinitely postpone the return of verdict by refusing to appear, feigning illness or in other ways purposely disrupting the proceedings. Finally, although the return of verdict is an important part of the trial that the defendant should be able to attend if he wants to, the trial is not any less fair when the defendant chooses to be absent after having attended the earlier phases of the trial. We conclude that the right to be present at the return of verdict may be waived by a defendant in a capital case.[22]

---

[22]In reaching this decision, we are aware of Supreme Court opinions written around the turn of the century in which similar issues were discussed. *See Hopt v. Utah,* 110 U.S. 574, 28 L. Ed. 262, 4 S. Ct. 202 (1884); *Lewis v. United States,* 146 U.S. 370, 36 L. Ed. 1011, 13 S. Ct. 136 (1892); *Diaz v. United States,* 223 U.S. 442, 56 L. Ed. 500, 32 S. Ct. 250 (1912). In none of these cases, however, did the court directly hold *as a matter of constitutional law* that the right of presence in a capital case cannot be waived. Any indications to the contrary therein were mere dicta. For a full analysis of these cases, *see Hall v. Wainwright,* 733 F.2d 766, 780–85 (11th Cir. 1984) (Hill, J., specially concurring), *cert. denied,* 471 U.S. 1107, 1111 (1985).

Moreover, the Court has recently implied that a defendant's right to be present can be waived, even in a capital case. *Illinois v. Allen,* 397 U.S. 337, 25 L. Ed. 2d 353, 90 S. Ct. 1057 (1970), involved a trial for armed robbery where the trial court removed the defendant from the courtroom after he repeatedly disrupted the proceedings. The Court stated that trial courts have discretion to choose among three options when confronted with a defendant who disrupts the proceedings. The judge can bind and gag the defendant, cite him for contempt, or remove him from the courtroom until he promises to conduct himself properly. In discussing the second option, the Court stated that "criminal contempt has obvious limitations as a sanction when the defendant is charged with a crime so serious that a very severe sentence such as death or life imprisonment is likely to be imposed." *Allen,* at 345. Additionally, the Court recognized that the option of binding and gagging a defendant has many "inherent disadvantages and limitations". *Allen,* at 344. Accordingly, in a death penalty case, the only viable option would be removal from the courtroom, in which case the defendant would have waived his right to be present through his own conduct.

A legal commentator has concluded that *Allen* renders it "highly doubtful" that the right to waive presence at a criminal trial is limited to noncapital cases.

▆ Finally, we must decide if Rice's rights were actually waived in this case. A waiver of constitutional rights can either be express or implied. In the latter circumstance, for example, a defendant can waive his right to be present at trial by voluntarily absenting himself from the proceedings. *Taylor v. United States,* 414 U.S. 17, 38 L. Ed. 2d 174, 94 S. Ct. 194 (1973); *State v. LaBelle,* 18 Wn. App. 380, 568 P.2d 808 (1977). A waiver of this constitutional right must be both knowing and voluntary. *LaBelle,* at 391 (citing *United States v. Tortora,* 464 F.2d 1202, 1208 (2d Cir.), *cert. denied,* 409 U.S. 1063 (1972)). Rice's suicide attempt was fully voluntary.[23] Moreover, the knowledge requirement can be satisfied even if, as here, the record does not disclose that the defendant was expressly told of his right to be present. *Taylor,* at 19–20. In this regard, the Supreme Court has stated as follows:

> It is wholly incredible to suggest that petitioner, who was at liberty on bail, had attended the opening session

3A C. Wright, *Federal Practice* § 723, at 18 n.2 (2d ed. 1982). The implications of *Allen* also led the Advisory Committee for the Federal Rules of Criminal Procedure to eliminate the suggestion in former Fed. R. Crim. P. 43 that the right of presence cannot be waived in capital cases. 3A C. Wright § 723, at 18 n.3.

Even more recently, the Court has indicated that the dicta in *Diaz* concerning a defendant's inability to waive his presence at a capital trial might be subject to reconsideration. In *Drope v. Missouri,* 420 U.S. 162, 43 L. Ed. 2d 103, 95 S. Ct. 896 (1975), the Court exhibited a reluctance to rely on the *Diaz* dicta, choosing instead to base its decision on the fact that no waiver had been shown. *See also Proffitt v. Wainwright,* 706 F.2d 311, 312 (11th Cir.) (noting the Supreme Court's reluctance in *Drope* to address this issue and then following suit in resolving the issue on other grounds), *cert. denied,* 464 U.S. 1002, 1003 (1983).

In light of the foregoing, we consider this issue to be unsettled in the Supreme Court and its opinions in no way preclude the conclusion we reach today.

[23]There is no evidence that Rice acted in any manner except out of his own free will. The evidence does not establish that Rice had become incompetent prior to his suicide attempt. Indeed, his attorneys agreed at the outset of the guilt phase that there was "no question about [Rice's] competency to stand trial." Moreover, Dr. Muscatel determined that although Rice was depressed and withdrawn following his suicide attempt, "he was not in the midst of psychotic decompensation and was probably never out of touch with reality." There being no evidence of incompetency or that his will had been overborne in any other manner, we conclude that Rice's acts were voluntary.

of his trial, and had a duty to be present at the trial, entertained any doubts about his right to be present at every stage of his trial. It seems equally incredible to us, as it did to the Court of Appeals, "that a defendant who flees from a courtroom in the midst of a trial—where judge, jury, witnesses and lawyers are present and ready to continue—would not know that as a consequence the trial could continue in his absence."

(Citations omitted.) *Taylor,* at 20 (quoting *United States v. Taylor,* 478 F.2d 689, 691 (1st Cir. 1973)), *quoted in LaBelle,* 18 Wn. App. at 396. This reasoning applies equally to the present case. Furthermore, the presumption that Rice knew his rights is strengthened by his having already, just days earlier, gone through the verdict process in the guilt phase. Therefore, Rice's waiver was both knowing and voluntary.

### E. Application of Ford v. Wainwright

Rice argues that a recent Supreme Court case precludes his execution. In *Ford v. Wainwright,* 477 U.S. 399, 91 L. Ed. 2d 335, 106 S. Ct. 2595 (1986), the Court held that inflicting the death penalty on an insane prisoner is cruel and unusual punishment under the Eighth Amendment. Washington has long had a common law rule to the same effect. *See State v. Davis,* 6 Wn.2d 696, 717, 108 P.2d 641 (1940). Under these holdings, even if a defendant was legally sane when he committed his crime and even if he was competent at the time of his trial and sentencing, he cannot be put to death if he becomes insane while his execution is pending.

Rice argues that *Ford v. Wainwright* should be applied because his "ability to distinguish between right and wrong is substantially impaired by reason of mental illness." Brief of Appellant, at 37. As an initial matter, we note that Rice has incorrectly stated the appropriate test of sanity. The "right and wrong" prong of the *M'Naghten* test is applicable only to determining sanity at the time of the crime's commission. *State v. Henke,* 196 Wash. 185, 193, 82 P.2d 544 (1938). When the issue is a defendant's sanity at

the time of trial, sentencing, or punishment, the test is "whether one is capable of properly appreciating his peril and of rationally assisting in his own defense." *Henke,* at 193. More recently, this test has been phrased in slightly different terms. "[A] person is competent to stand trial if he has the capacity to understand the nature of the proceedings against him and if he can assist in his own defense." *State v. Ortiz,* 104 Wn.2d 479, 482, 706 P.2d 1069 (1985), *cert. denied,* 476 U.S. 1144 (1986), citing RCW 10.77.010(6) and RCW 10.77.050. *Henke* makes clear that this standard applies equally in the context of a person's insanity at the time of punishment as it does at the time of trial.

Rice argues that his mental illness is established by the evidence presented at trial. We note, however, that the trial court concluded that Rice was competent for the formal imposition of his death sentence more than a month after the jury rendered its verdicts.[24] This conclusion was based on Dr. Muscatel's opinion that Rice had recovered from the effects of his suicide attempt and was "completely competent" to proceed with sentencing. Implicit in the trial court's conclusion is the finding that Rice was able to understand the nature of the sentencing and could assist his attorney's preparations. Rice's attorneys on appeal have not indicated that his condition has changed in any way since that time. Once a defendant has been determined to be sane, that sanity is presumed to continue until contrary evidence is shown. *Henke,* at 193–94. No such showing having been made, we presume that Rice remains sane, and, thus, *Ford v. Wainwright* by its express terms does not apply.

Apparently, however, Rice asks us to extend *Ford v. Wainwright* so as to preclude the imposition of the death penalty against a prisoner who, even though legally competent and sane, has a substantial mental illness. There was, indeed, some evidence of mental illness in this case, Dr.

---

[24]Rice has not appealed from this decision.

Muscatel having described Rice as "an extremely disturbed man, who has both schizoid and paranoid features." Nevertheless, courts in other jurisdictions have uniformly refused to extend the prohibition against executing insane persons to those whose illness does not reach the level of insanity. *See State v. Gretzler,* 135 Ariz. 42, 46–48, 659 P.2d 1, *cert. denied,* 461 U.S. 971 (1983); *Harris v. State,* 499 N.E.2d 723, 726–27 (Ind. 1986), *cert. denied,* 107 S. Ct. 2490 (1987); *Farmer v. State,* 101 Nev. 419, 422, 705 P.2d 149 (1985), *cert. denied,* 476 U.S. 1130 (1986); *Commonwealth v. Banks,* 513 Pa. 318, 355–56, 521 A.2d 1, *cert. denied,* 108 S. Ct. 211 (1987); *Commonwealth v. Fahy,* 512 Pa. 298, 316–17, 516 A.2d 689 (1986). Historically, the common law rule applied only to insane persons, and in this appeal Rice offers no persuasive reason why it should be extended to others. Accordingly, we join those other states in refusing to extend *Ford v. Wainwright* and the common law rule to those who are not insane.

### F. Constitutionality of Death Penalty Statutes

Rice challenges the constitutionality of Washington's death penalty statutes, RCW 10.95, by asking this court to reconsider its decision upholding them in *State v. Campbell,* 103 Wn.2d 1, 691 P.2d 929 (1984), *cert. denied,* 471 U.S. 1094 (1985). Rice asks this court to adopt the reasoning of the *Campbell* dissent; that is, to hold that our capital punishment scheme violates equal protection because of its arbitrary application and that it is void for vagueness because of the "standardless discretion" a prosecutor has in seeking the death penalty. *Campbell,* at 42 (Utter, J., concurring in part, dissenting in part). However, this court has repeatedly rejected these and similar challenges to the constitutionality of our death penalty statutes, and "[n]o useful purpose would be served by again plowing this same ground". *State v. Mak,* 105 Wn.2d 692, 758–60, 718 P.2d 407 (and cases cited therein), *cert. denied,* 107 S. Ct. 599 (1986). Our position on these issues remains unchanged.

## G. Death Sentence Review

The jury's duty in the sentencing phase was to answer the following question:

> "Having in mind the crime of which the defendant has been found guilty, are you convinced beyond a reasonable doubt that there are not sufficient mitigating circumstances to merit leniency?"

RCW 10.95.060(4). The jury unanimously answered this question in the affirmative. Under Washington's statutes, this court is to review that decision by analyzing three separate issues. RCW 10.95.130(2)(a)–(c).

### 1. Sufficiency of the Evidence

We must first determine if there was sufficient evidence to support the jury's verdict. RCW 10.95.130(2)(a). Rice urges this court to apply a standard of review which would require assessment of the evidence in a light most favorable to the defendant. Rice argues that because there was evidence supporting the existence of one or more mitigating circumstances, this court should find that there was insufficient evidence to support the jury's decision.

This court, however, has adopted a different test. Our task is to determine if "'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found sufficient evidence to justify this affirmative finding beyond a reasonable doubt.'" *State v. Rupe,* 108 Wn.2d 734, 765, 743 P.2d 210 (1987) (quoting *State v. Mak,* 105 Wn.2d 692, 761, 718 P.2d 407, *cert. denied,* 107 S. Ct. 599 (1986)). Under the *Mak* test, a rational trier of fact in this case could certainly have found beyond a reasonable doubt that leniency was not merited. Rice intentionally and with premeditation killed all four members of a family, including two young children. The murders were committed in a particularly cold–blooded and violent fashion. Rice never indicated any remorse for the deaths of the parents and had planned their deaths for months. Moreover, he killed the children for no reason other than to prevent them from identifying him.

As Rice points out, evidence was also presented that related to possible mitigating circumstances. We now discuss each area of this evidence. First, there was evidence presented concerning Rice's mental health. We have already summarized that evidence earlier in this opinion. Second, defense counsel argued to the jury that Rice had no criminal history, and indeed the prosecution at no point presented any evidence to the contrary.[25] In this same vein, there was testimony that Rice's only known previous acts of violence were self–directed, in that he had twice before attempted suicide. Third, there was evidence that Rice had been mentally and physically abused by his older brothers during his childhood. One of his older brothers testified briefly to various occasions when they beat or kicked him and called him names because they were embarrassed at his failure to fit in with other children. Indeed, at least one of Rice's suicide attempts occurred immediately after one of these occasions. Finally, defense counsel argued to the jury that Rice could pose no future danger to the community because if his life were spared he would be sentenced to life imprisonment without possibility of release.

Nevertheless, the mere presence of mitigating factors does not require a jury to grant leniency, so long as it is convinced beyond a reasonable doubt that any mitigating factors are outweighed by the circumstances of the crime. In this case, the mitigating circumstances were relatively unpersuasive. In other words, there was sufficient evidence before the jury to warrant its decision.

Rice further contends that we cannot affirm his sentence unless we can conclude *beyond a reasonable doubt* that there was sufficient evidence to support the jury's decision. However, this mischaracterizes the role of an appellate court. We do not fully assess the evidence and weigh the aggravating factors against the mitigating factors the way

---

[25]We note, however, that Rice referred to being "wanted on a different charge" in the letter he wrote that was seen by Robert Brown, leading to Rice's arrest.

the jury did. We are not in a position to do so, not having the witnesses testifying directly before us. Our role is to determine if there was sufficient evidence to support the jury's verdict. Because this is an issue of law, not fact, the "beyond a reasonable doubt" standard does not apply to our decision. *See State v. Jeffries,* 105 Wn.2d 398, 429 n.5, 717 P.2d 722, *cert. denied,* 107 S. Ct. 328 (1986); *State v. Green,* 94 Wn.2d 216, 221, 616 P.2d 628 (1980). Even the importance of specially safeguarding the rights of a defendant in a capital case does not justify altering these rules.

2. Proportionality

Under RCW 10.95.130(2)(b), this court must consider both the crime and the defendant in determining if Rice's death sentence is excessive or disproportionate to the penalty imposed in similar cases. "Similar cases" include

cases reported in the Washington Reports or the Washington Appellate Reports since January 1965, where imposition of capital punishment was considered, and cases in which reports have been filed with this court pursuant to RCW 10.95.120. Under RCW 10.95.120, "[i]n all cases in which a person is convicted of aggravated first degree murder, the trial court shall" submit a report with details about the defendant and the crime. Thus, "similar cases" include cases where the defendant was convicted of first degree aggravated murder regardless of whether the death penalty was sought.

*State v. Rupe,* 108 Wn.2d 734, 767, 743 P.2d 210 (1987).

Proportionality requires that "a death sentence must not be affirmed where death sentences have not generally been imposed in similar cases, nor where it has been 'wantonly and freakishly imposed.'" *Rupe,* at 767 (citing *State v. Harris,* 106 Wn.2d 784, 798, 725 P.2d 975 (1986), *cert. denied,* 107 S. Ct. 1592 (1987)). Occasional aberrational outcomes do not require a reversal, however, so long as the death sentence has been imposed generally in similar cases. *Rupe,* at 767; *Harris,* at 798.

The beginning point for reviewing the proportionality of Rice's sentence is *Rupe.* Of all the comparison cases, only that case involved the same three aggravating factors that

are present here. *Rupe,* at 768. In fact, the majority opinion in *Rupe* used the judge's trial report in Rice as its primary comparison case. *Rupe,* at 768. The three factors present in both cases were (1) the protection or concealment of the perpetrator's identity, (2) the murders involved multiple victims as part of a common scheme or plan, and (3) the murders were committed in the course of or furtherance of robbery in the first degree. *Rupe,* at 768. Moreover, this court in *Rupe* also examined the previous aggravated first degree murder cases involving two of these three aggravating factors and concluded that Rupe's death sentence was not disproportionate. All these statements equally apply to Rice's case, and no cases have been decided since *Rupe* that would change this analysis.

Rice's crime is also similar in nature to those committed in two other cases recently before this court in which we affirmed death sentences. In *State v. Campbell,* 103 Wn.2d 1, 691 P.2d 929 (1984), *cert. denied,* 471 U.S. 1094 (1985), the defendant brutally killed three victims, one an 8–year–old girl. Two of the victims were killed in order to conceal the defendant's identity as the murderer of the third. Four aggravating factors were found in that case.[26] *Campbell,* at 5–13. In *State v. Jeffries,* 105 Wn.2d 398, 717 P.2d 722, *cert. denied,* 107 S. Ct. 328 (1986), the defendant killed a married couple, shooting the husband in the back of the head "gangland style", and then shooting the wife after she had fled and barricaded herself into another room. The jury

---

[26]The aggravating factors found by the jury in *Campbell* were: "(1) Defendant was serving a term of imprisonment at the time of the act resulting in death, RCW 10.95.020(2); (2) the victims (Barbara and Renae) were former witnesses in an adjudicated proceeding against the defendant and the murder was related to the exercise of their official duties performed at the proceeding, RCW 10.95-.020(6)(b); (3) defendant committed the murder of Barbara and Shannah to protect or conceal his identity, RCW 10.95.020(7); and (4) the murder was committed in the course of, or in furtherance of, or in immediate flight from the crime of burglary in the first degree, RCW 10.95.020(9)(c)." *Campbell,* at 13.

found two aggravating factors.[27] *Jeffries,* at 406–09.

Finally, this court's proportionality review must take into account Rice's own personal characteristics, such as his lack of criminal history and his mental illness. A lack of prior criminal history does not by itself render a death sentence disproportionate. *See Rupe,* at 770. The issue of mental illness requires more detailed analysis. Our survey of reports from trial courts involved in aggravated first degree murder cases indicates that there were four other cases in which the trial court deemed there to be credible evidence of a mental disorder or diminished mental capacity. In each of these cases, the death penalty was not imposed, the defendant receiving instead life imprisonment without parole. State v. Stevenson, Skamania County cause 87–1–00011–5 (sentenced June 12, 1987); State v. Dykgraaf, Clark County cause 86–1–00111–5 (sentenced Oct. 30, 1986); State v. Petersen, Pierce County cause 85–1–01855–1 (sentenced June 17, 1986); State v. Ng, King County cause 83–1–00504–0 (sentenced Oct. 25, 1983).

However, in two of these cases, State v. Ng and State v. Stevenson, there were other significantly mitigating factors that likely caused the jury to grant leniency. Stevenson was a 17–year–old boy when he killed his stepfather and two other members of his family, and there was evidence that he had been abused by his stepfather. Benjamin Ng also was young—20 years old—and there was evidence that he did not fire any of the shots in the Wah Mee massacre. In these two cases, it is difficult to determine the extent to which the defendants' mental disturbance caused the juries to grant leniency; thus, they are not very useful as comparison cases for the issue at hand.

---

[27]In *Jeffries,* the jury found as aggravating factors that "'[t]he defendant committed the murder to conceal the commission of a crime or to protect or conceal the identity of any person committing a crime'", based on RCW 10.95.020(7), and that "'[t]here was more than one victim and the murders were part of a common scheme or plan or the result of a single act of the defendant'", based on RCW 10.95.020(8). *Jeffries,* at 406–07.

The other two cases lend no greater support to Rice's position. Dykgraaf killed one victim and Petersen killed two, significantly fewer than Rice's four victims, and neither one murdered children. Moreover, in neither case was the jury able to reach a unanimous verdict of leniency. This factor was particularly important in State v. Dykgraaf, where the jury voted 11 to 1 in favor of the death penalty and the lone dissenting juror indicated to the other jurors a strong philosophical opposition to the death penalty that he did not reveal during voir dire. Furthermore, Petersen was diagnosed to have "atypical psychosis", a mental illness more severe than Rice's own diagnosis. Because of these factors, neither State v. Petersen nor State v. Dykgraaf establishes that Rice's death sentence was "wantonly and freakishly imposed".

Given the heinous nature of Rice's crimes, the number and severity of the aggravating factors, and the number of his victims, we cannot conclude that Rice's death sentence was excessive or disproportionate, despite his arguments concerning mitigating circumstances.

3. <u>Passion or Prejudice</u>

We must also determine if Rice's sentence was "brought about through passion or prejudice". RCW 10.95.130(2)(c). Rice contends that his death sentence cannot be affirmed unless this court can conclude *beyond a reasonable doubt* that the jury's finding was not the result of passion or prejudice. However, as we discussed above with respect to the sufficiency of the evidence, that standard is not applicable to an appellate court's decision on an issue of law.

Rice advances seven arguments with which he attempts to show that passion or prejudice influenced the sentencing phase. We have addressed many of these in other parts of our opinion, and the remaining arguments have no merit. We conclude that Rice's sentence was not the result of passion or prejudice.

CONCLUSION

The judgment and sentence in this case are affirmed.

BRACHTENBACH, ANDERSEN, CALLOW, and GOODLOE, JJ., concur.

DORE, J., concurs in the result.

UTTER, J. (dissenting)—I would reverse Rice's sentence based on serious errors committed at the sentencing phase of his trial. The prosecutor improperly argued to the jury to sentence Rice using the point of view of the children he killed. Additionally, Rice had a right to be present at the rendering of the verdict, and he did not waive that right. We may not assume the trial court's error to be harmless.

I

The majority holds that it was proper argument for the prosecutor to urge the jurors to place themselves in the shoes of the two children. Majority, at 608. It relies on a California case holding that assessment of the offense from the victim's viewpoint is improper at the guilt phase, but "germane to the task of sentencing." Majority, at 608, quoting *People v. Haskett,* 30 Cal. 3d 841, 863–64, 640 P.2d 776, 180 Cal. Rptr. 640 (1982). This is not the law in Washington, and it also is inconsistent with the United States Supreme Court's latest analysis under the eighth amendment to the United States Constitution. *Booth v. Maryland,* __ U.S. __, 96 L. Ed. 2d 440, 107 S. Ct. 2529 (1987) (holding a "victim impact statement" at the sentencing phase of a capital case irrelevant and prejudicial).

In Washington, the sentencing structure is intended to penalize defendants in proportion to the magnitude of their crimes. RCW 9.94A.010. The United States Supreme Court also holds that the jury's determination in the sentencing phase of a capital case must focus only on the individual characteristics of the defendant and the crime; the impact of the crime on the victim or the victim's family are not

relevant to sentencing. *Booth,* 96 L. Ed. 2d at 449. To hold otherwise would invite arbitrary imposition of the death sentence and violate the eighth amendment to the United States Constitution. *Booth,* 96 L. Ed. 2d at 448. Victims of any type of crime are the most sympathetic objects of any criminal procedure. Their desires with respect to sentencing of defendants, however, whether for mercy or revenge, may not, under the holding in *Booth,* be considered on the issue of the death sentence.

The majority cites both *Booth v. Maryland, supra,* and *Brooks v. Kemp,* 762 F.2d 1383 (11th Cir. 1985), *vacated and remanded,* 106 S. Ct. 3325 (1986), to support its holding that the prosecutor's argument was proper. However, both those cases support the opposite conclusion. In *Booth,* the Court held inadmissible a "victim's impact statement" which presented to the jury the full impact of the defendant's act on the family of the victims. The Court held:

> While the full range of foreseeable consequences of a defendant's actions may be relevant in other criminal and civil contexts, we cannot agree that it is relevant in the unique circumstance of a capital sentencing hearing. In such a case, it is the function of the sentencing jury to "express the conscience of the community on the ultimate question of life or death." . . . When carrying out this task the jury is required to focus on the defendant as a "uniquely individual human bein[g]." The focus of a [victim impact statement], however, is not on the defendant, but on the character and reputation of the victim and the effect on his family. These factors may be wholly unrelated to the blameworthiness of a particular defendant.

*Booth,* 96 L. Ed. 2d at 449. Here, the prosecutor's argument asked the jury to place itself in the shoes of the victims. This is even greater error than the admission of evidence of the crime's effect on the victims; it has the jury take the perspective of the victims rather than an objective perspective on the culpability of the defendant.

Similarly, in *Brooks,* at 1409, the 11th Circuit Court of Appeals held it improper for the prosecutor to focus excessively on characteristics of the victims. To go beyond focusing on attributes of the victim, and to take the victim's perspective of the crime in determining the sentence is not within the scope of argument the *Brooks* court found permissible.[28]

The argument to place oneself in the shoes of the victim is similar to the "golden rule argument": do to the defendant as you would wish to be done for you if you were the plaintiff. Here the argument is essentially the same: do to the defendant as you would wish to be done for you if you were the victim. Golden rule arguments are universally held improper because they are inflammatory. *Adkins v. Aluminum Co. of Am.,* 110 Wn.2d 128, 750 P.2d 1257 (1988); *Delaware Olds, Inc. v. Dixon,* 367 A.2d 178, 179 (Del. 1976). The majority seems to hold that such inflammatory argument is impermissible in civil cases, but permissible in determining a criminal sentence. See footnote 17. To the contrary, the need to reduce passion and prejudice is more crucial at the sentencing phase of a capital crime than at any other event in the judicial system.

In considering aggravating or mitigating factors, it is entirely proper for the jury to consider the nature of the crime, including if it was particularly cruel, as it was here. RCW 10.95.060(4). However, this must be limited by what the United States Supreme Court has declared are the constitutional barriers. It was error for the prosecutor to urge the jury to use the children's perspective in determining punishment.

## II

The majority wrongly finds no error in the rendering of the verdict in Rice's absence. Rice had a constitutional right to be present, which he did not waive. The rendering

---

[28]In *Brooks,* the prosecutor "ticked off some personal attributes [of the victim] shown by the evidence". The court stated: "These comments did personalize the victim, but they were brief enough that we cannot conclude that they injected prejudicial or irrelevant material into the sentencing decision." *Brooks,* at 1409.

of the verdict in his absence also violated the explicit terms of CrR 3.4.

Washington, both before and after statehood, has recognized the right of criminal defendants to be present at every stage of trial, including the rendering of the jury verdict, as a fundamental right. *Shapoonmash v. United States,* 1 Wash. Terr. 188 (1862); *State v. Costello,* 29 Wash. 366, 69 P. 1099 (1902); *State v. Schafer,* 156 Wash. 240, 286 P. 833 (1930). The right is guaranteed by Const. art. 1, § 22 (amend. 10), which provides in relevant part, "In criminal prosecutions the accused shall have the right to appear and defend in person . . ." The right is also protected by the sixth and fourteenth amendments to the United States Constitution, as well as the common law. *See Illinois v. Allen,* 397 U.S. 337, 25 L. Ed. 2d 353, 90 S. Ct. 1057 (1970); 8B J. Moore, *Federal Practice* ¶ 43.02[1] (2d ed. 1988).

The common law rule accepted in nearly every jurisdiction is that in capital cases a criminal defendant must be present at the rendering of the verdict, and this right may not be waived. An "overwhelming weight of authority" sustains the following propositions:

First. In the trial of all felonies, not capital, where the defendant is on bond, and has been present throughout the delivery of the testimony, up to the rendition of the verdict, but is absent at the rendition of the verdict voluntarily, he will not be permitted to avail himself of his own wrong in being thus voluntarily absent, but the verdict may be properly received in his absence. In other words, he may waive the right to be present when the verdict is received, which is not, as seems popularly supposed, a constitutional right, though a very sacred right, secured by the common law as well as by statute.

Second. *Wherever the charge is a capital one, the courts have held uniformly, in favorem vitae, that the defendant cannot waive his right to be present,* and that whether he be in jail, subject to the power of the court to produce him, or on bond, it is fatal error to receive the verdict in his absence.

Third. Even in felonies not capital, if the defendant be in jail when the verdict is received, it is fatal error.

Fourth. In cases not capital, the right of the defendant, where he is on bond, to waive his own presence when the verdict is received, is strictly his personal right, and no such waiver can be exercised for him by his own counsel.

(Italics mine.) *Sherrod v. State,* 93 Miss. 774, 778, 47 So. 554 (1908); *see also Scott v. State,* 113 Neb. 657, 204 N.W. 381 (1925); *People v. La Barbera,* 274 N.Y. 339, 8 N.E.2d 884 (1937); Annot., *Absence of Accused at Return of Verdict in Felony Case,* 23 A.L.R.2d 456 (1952), and cases cited therein.

The United States Supreme Court reached the same conclusion in *Diaz v. United States,* 223 U.S. 442, 56 L. Ed. 500, 32 S. Ct. 250 (1912). In *Diaz,* the Court stated in dicta:

In cases of felony our courts, with substantial accord, have regarded [the right of the defendant to be present] as extending to every stage of the trial, inclusive of the empaneling of the jury and the reception of the verdict, and as being scarcely less important to the accused than the right of trial itself. And with like accord they have regarded an accused who is in custody and one who is charged with a *capital offense as incapable of waiving the right;* the one, because his presence or absence is not within his own control, and the other because, in addition to being usually in custody, he is deemed to suffer the constraint naturally incident to an apprehension of the awful penalty that would follow conviction. But, *where the offense is not capital* and the accused is *not in custody,* the prevailing rule has been, that if, after the trial has begun in his presence, he voluntarily absents himself, this does not nullify what has been done or prevent the completion of the trial, but, on the contrary, operates as a waiver of his right to be present and leaves the court free to proceed with the trial in like manner and with like effect as if he were present.

(Citations omitted. Italics mine.) 223 U.S. at 455. One reason for the rule against allowing waivers in capital cases is the "jealous policy to protect a defendant against himself and to vouchsafe absolute fairness to him . . ." *Lee v. State,* 244 Ala. 401, 404, 13 So. 2d 590 (1943). Another is to impress upon the jury the serious consequences of its decision.

"It would be contrary to the dictates of humanity to let [the defendant] waive the advantage which a view of his sad plight might give him by inclining the hearts of the jurors to listen to his defence with indulgence."

*Lewis v. United States,* 146 U.S. 370, 372, 36 L. Ed. 1011, 13 S. Ct. 136 (1892) (quoting *Prine v. Commonwealth,* 18 Pa. 103, 104 (1851)).

This court has not determined whether the Washington Constitution grants a nonwaivable right to be present in a capital case including the rendering of the verdict. The wording of Const. art. 1, § 22 (amend. 10) differs significantly from its federal counterpart. However, it is not necessary for us to determine this issue here, because the common law and CrR 3.4 both are clear that there is such a right.[29]

CrR 3.4(b) states in relevant part:

In prosecutions for offenses not punishable by death, the defendant's voluntary absence after the trial has commenced in his presence shall not prevent continuing the trial to and including the return of the verdict.

It is not disputed that this rule means that defendants may not waive their presence in capital cases, and every case interpreting the former federal rule counterpart to CrR 3.4 has so held. *See* 8B J. Moore, *Federal Practice* ¶ 43.02 (2d ed. 1988). The explicit statement in CrR 3.4 is the binding law of this state. I am therefore puzzled and disturbed by the majority's attempts to undercut the rule in a footnote:

This development [the change in the federal rule to allow the courts to determine the validity of waivers] leads us to question the advisability of CrR 3.4(b)'s current distinction between capital and noncapital cases. Nevertheless, *even accepting the rule as it is presently written,* we conclude that reversible error was not committed.

(Italics mine.) Footnote 21.

---

[29]This court prefers to resolve cases where possible on the basis of the common law, rules and statutes before referring to the constitution. The absence of argument on state constitutional grounds also hinders this court from deciding this case on that basis. *See State v. Wethered,* 110 Wn.2d 466, 755 P.2d 797 (1988).

Aside from the obvious ex post facto infirmity of changing the rule to Rice's detriment after his trial, every principle of fairness requires this court to be bound by rules we have promulgated until changed according to established procedures. *See* GR 9. The majority's unwillingness to admit that CrR 3.4 was binding at Rice's trial, and was clearly violated, can result only in confusion with regard to that and every other rule promulgated by this court. Moreover, the Legislature recently repealed statutes dating back to 1881 granting capital defendants the nonwaivable right to be present at trial and judgment because those statutes were superseded by CrR 3.4. Laws of 1984, ch. 76, §§ 29, 33 (repealing RCW 10.46.120 and RCW 10.64.020). We have no right to question now the applicability of CrR 3.4. The court thus erred in allowing the jury to render the verdict in Rice's absence.

### III

Even if Rice had the right to waive his presence, there is no indication he did so. Where a defendant is in custody, waiver of the right to be present should be express. 3A C. Wright, *Federal Practice* § 723 (1982); Annot., *supra* § 16, at 494, and cases cited therein and in the Later Case Service. "At least an on–the–record statement in open court by the defendant himself should be required." *Cross v. United States,* 325 F.2d 629, 633 (D.C. Cir. 1963). The holding of the case on which the majority relies, *Taylor v. United States,* 414 U.S. 17, 38 L. Ed. 2d 174, 94 S. Ct. 194 (1973), is limited to voluntary absence by a defendant not in custody, and is inapplicable here. *United States v. Gordon,* 829 F.2d 119, 125 n.7 (D.C. Cir. 1987). Rice never expressly waived his right to be present, and he was unconscious when the court made the decision to hear the jury's verdict in his absence. The majority makes a series of erroneous assumptions and presumptions in reaching the conclusion there was a waiver.

First of all, the majority concludes that the suicide attempt was voluntary. Majority, at 619. In doing so, the

majority first wrongly places the burden on Rice to show his suicide was not voluntary. *In re James,* 96 Wn.2d 847, 851, 640 P.2d 18 (1982) ("The State carries a heavy burden of demonstrating a voluntary, knowing, and intelligent waiver of any constitutional right"). Moreover, there was never any fact–finding hearing to determine the cause of Rice's suicide attempt.[30] In a case with similar facts, the United States Supreme Court held that there must be a factual determination as to whether mental instability caused the defendant to attempt suicide before the rendering of the verdict. *Drope v. Missouri,* 420 U.S. 162, 181–82, 43 L. Ed. 2d 103, 95 S. Ct. 896 (1975). The burden rests on the prosecution to show that the defendant "voluntarily absented" himself from the trial. *Greenberg v. United States,* 280 F.2d 472, 476 (1st Cir. 1960). Here, the State has not sustained this burden with any facts or evidence.

Secondly, the majority presumes Rice knew the scope of his right to be present at the time of the suicide attempt. However, the record must affirmatively show that the defendant knows the entire scope of the constitutional right before it may be found to be waived. *State v. Tetzlaff,* 75 Wn.2d 649, 652, 453 P.2d 638 (1969). Although Rice was found competent to stand trial, and the jury found him liable for his actions applying the *M'Naghten* standards, the record is clear that Rice had severe mental problems and was delusional. Under these circumstances, the presumption that a defendant knows the law is inapplicable. Rice did not consult an attorney before "waiving his right".[31] The court did not inform him of his right, and there is no other evidence Rice knew of his right. The fact that Rice

---

[30]The court never made any determination that Rice himself waived his right, but instead mistakenly relied on the waiver by Rice's attorney.

[31]One commentator believes that the United States Supreme Court opinion in *Estelle v. Smith,* 451 U.S. 454, 68 L. Ed. 2d 359, 101 S. Ct. 1866 (1981) suggests "that a capital defendant who is represented by an attorney can not waive his sixth amendment right at a pretrial stage unless he first consults with his attorney." White, *Waiver and the Death Penalty: The Implications of Estelle v. Smith,* 72 J. Crim. L. & Criminology 1522, 1547 (1981).

was present during the guilt phase of his trial cannot in itself have been notice to him that he had a constitutional right to be present.

Finally, the majority draws an insupportable connection between Rice's suicide and an intention to relinquish a constitutional right. The majority confuses the suicide attempt with an attempt to escape, which leads it to refer to inapplicable case authority. Majority, at 620; *see Wade v. United States,* 441 F.2d 1046, 1049–50 (D.C. Cir. 1971) (distinguishing voluntary absences involving escape from absences where there is no evidence of a willful intention to interfere with the court's processes). In doing so, the majority ignores the fact that Rice had attempted suicide on previous occasions for reasons apparently unconnected with waiver of constitutional rights. If we are to make assumptions without the benefit of a factual record, as the majority does, the more logical assumption is that Rice's act was related to his obvious mental impairments, or was a result of desperation, or deep agitation at waiting more than 24 hours for the jury's verdict. It is a long stretch for the imagination to conclude that the suicide attempt was a knowing and voluntary waiver of any right.

The net effect of the majority's analysis is the presumption of a knowing and voluntary waiver of the right to be present, a right which nearly every jurisdiction has found to be so fundamental that no waiver at all is allowed. The majority thus ignores the rule that every reasonable presumption is indulged against waiver of a constitutional right. *State v. Coyle,* 95 Wn.2d 1, 7, 621 P.2d 1256 (1980).

It has been pointed out that "courts indulge every reasonable presumption against waiver" of fundamental constitutional rights and that we "do not presume acquiescence in the loss of fundamental rights." . . .

. . .

. . . This protecting duty imposes the serious and weighty responsibility upon the trial judge of determining whether there is an intelligent and competent waiver by the accused.

(Footnotes omitted.) *Johnson v. Zerbst,* 304 U.S. 458, 464–65, 82 L. Ed. 1461, 58 S. Ct. 1019, 146 A.L.R. 357 (1938), *quoted in Cross,* 325 F.2d at 631.

Here, the court could have obtained a statement from Rice as to whether or not he intended to waive his constitutional right to be present. Its failure to do so was constitutional error.

## IV

The majority admits there is a constitutional right to be present at the rendering of the verdict. However, it finds there was a waiver of that right and therefore implies, without actually admitting, only CrR 3.4 and the common law were violated in receiving the jury's verdict in Rice's absence. The majority therefore applies a less strict standard of review in determining whether there was harmless error. However, even applying the most tolerant standard of review, the court's error in receiving the verdict in Rice's absence could not have been harmless.

The majority in essence assumes that error relating to a defendant's absence at the rendering of a verdict is harmless. This conclusion creates, in every situation in which such error occurs, a wrong without a remedy. It is hard to imagine how prejudice could be proven or disproven, as it is impossible to tell if a juror would look at a defendant and state his or her assent to the death sentence unless that actually happens.

The District of Columbia Circuit of the United States Court of Appeals was faced with a similar quandary in *Wade v. United States,* 441 F.2d 1046 (D.C. Cir. 1971). In *Wade,* the defendant in a noncapital case overslept, and the court gave the jury the *Allen* charge and allowed the jury to return its verdicts in the defendant's absence. The District of Columbia Circuit Court of Appeals found this to violate Fed. R. Crim. P. 43 because the absence was not shown to be "voluntary", and further found that it could not assume the error to be harmless.

It is possible that defendant's absence made no difference in the result reached. The standard by which to determine whether reversible error occurred, however, is not whether the accused was actually prejudiced, but whether there is "any reasonable possibility of prejudice," . . . In considering whether this standard is met, we must keep in mind the importance of a defendant's presence at all stages of his trial. Indeed, this aspect of a trial has constitutional prestige in the Sixth Amendment guarantee of the right to confront adverse witnesses—in good part a constitutional recognition of a psychological influence. Though perhaps to a less degree, the same influence pertains to the right of confrontation of defendant and jury, aside from the usefulness the accused may be to his counsel. . . . Moreover, there is the reasonable possibility that the jury speculated adversely to the defendant about his absence from the courtroom.

. . . Trial counsel's disclaimer on the remand of any usefulness to him of defendant's presence during the proceedings subsequently to the retirement of the jury . . . is not an acceptable substitute for what might have eventuated; nor is defendant's answer to a question at the remand hearing, which indicated he did not know what he might have done if present, sufficient to outweigh the reasonable possibility of helpfulness to his case if present. As previously noted his absence was when judge and jury were engaged in open court in proceedings directly bearing upon the decisional processes of the jury. *To hold his absence harmless would be too speculative. It would assume to reconstruct what might have eventuated had he been present, when that cannot truly be reconstructed with a degree of certainty essential to avoid the reasonable possibility of prejudice.*

(Footnotes omitted. Italics mine.) *Wade,* at 1050–51.

In capital cases the defendant's presence at the verdict is even more crucial, and it is far less justifiable to assume, as the majority does, that the defendant's presence would make no difference. There is a qualitative difference between a juror facing the defendant and stating assent to any other verdict and facing the defendant and stating that he votes to put him to death.

The nature of the jury's decision at the sentencing phase also makes it impossible for this court to determine the error to be harmless. When the jury acts as fact finder, this court has been willing to consider the weight of the evidence against the defendant to find error harmless. *E.g., State v. Cunningham*, 93 Wn.2d 823, 831–33, 613 P.2d 1139 (1980). In such cases we are willing, in essence, to place ourselves in the position of fact finder to determine what would have happened if the defendant had received a fair jury trial with no error. In the sentencing phase of a capital case, however, the jury no longer acts as finder of fact, but instead is determining whether the defendant deserves to die. The jury has wide discretion to withhold the death penalty. When an error interferes with the jury's determination to withhold the death penalty, we have no basis upon which to determine the outcome if there had been no error. The majority's determination that the jury would have sentenced Rice to death if the trial court had not erred preempts the jury's crucial role in a capital case. *See* RCW 10.95.050.

The rendering of the verdict is not a mere mechanical recital of the vote in the jury room. The defendant has a right to a poll of the jury. CrR 6.16(a)(3). After the verdict is announced to the court, it may not be accepted by the court if a poll taken before the verdict is recorded indicates a lack of unanimity. "Jurors are not bound by votes in the jury room and remain free to register dissent even after the verdict has been announced, though before the verdict is recorded." *United States v. Taylor*, 507 F.2d 166, 168 (5th Cir. 1975). *See also, e.g., Chipman v. Superior Court*, 131 Cal. App. 3d 263, 182 Cal. Rptr. 123 (1982); *People v. Kellogg*, 77 Ill. 2d 524, 397 N.E.2d 835 (1979); *Commonwealth v. Corbin*, 215 Pa. Super. 63, 257 A.2d 356 (1969). The polling of the jury thus affords criminal defendants "the very real benefit of reconsideration and change of mind or heart." *Taylor*, at 168. "There can be no question of the right of a juror, when polled, to dissent from a verdict to which he has agreed in the jury room . . ." *United States*

*v. Sexton,* 456 F.2d 961, 966 (5th Cir. 1972) (quoting *Bruce v. Chestnut Farms–Chevy Chase Dairy,* 126 F.2d 224, 225 (D.C. Cir. 1942)).

Besides affording jurors the opportunity to change their minds, polling impresses upon them the need to be sure of their verdict. Jurors may go along with the vote of the majority in the jury room, and then later, upon direct questioning by the court, assert that their original vote did not in fact reflect their true decision. "[T]he right to poll the jury is the right to require each juror individually to state publicly his assent to or dissent from the returned verdict which has been announced in open court in his presence." *Miranda v. United States,* 255 F.2d 9, 18 (1st Cir. 1958), *quoted in United States v. Love,* 597 F.2d 81, 84 (6th Cir. 1979).

> The object of a poll is to give each juror an opportunity, before the verdict is recorded, to declare in open court his assent to the verdict which the foreman has returned and thus to enable the court and parties "to ascertain for a certainty that each of the jurors approves of the verdict as returned."

*United States v. Edwards,* 469 F.2d 1362, 1366 (5th Cir. 1972) (quoting *Humphries v. District of Columbia,* 174 U.S. 190, 194, 43 L. Ed. 944, 19 S. Ct. 637 (1899)).

The poll of the jurors was a crucial stage of Rice's trial. Any one juror disavowing the verdict would have meant the difference between life and death for him.

> The presence of the accused is not a mere form. It is of the very essence of a criminal trial not only that the accused shall be brought face to face with the witnesses against him, but also with his triers. He has a right to be present not only that he may see that nothing is done or omitted which tends to his prejudice, but to have the benefit of whatever influence his presence may exert in his favor. And at no time in the whole course of the trial is this right more valuable than at the final step when the jury are to pronounce that decision which is to restore him to the liberty of a citizen, or to consign him to the scaffold or to a felon's cell in the state prison.

*Temple v. Commonwealth,* 77 Ky. 769, 771 (1879).

Rather than assuming lack of prejudice, as the majority does, the better–reasoned opinions of other courts presume prejudice from the defendant's absence at the rendering of the verdict, even if the defendant's absence was his own fault. In *State v. Okumura,* 58 Hawaii 425, 570 P.2d 848 (1977), the defendant tried to escape custody before closing argument, but was captured and sustained injuries. While his injuries were attended to, the court overruled his attorney's objection and continued with the trial, including the rendering of the verdict in the defendant's absence. The Hawaii Supreme Court reversed the conviction, holding the prosecution had "failed to negate the presumption of prejudice" to the defendant from hearing the verdict in his absence. *Okumura,* at 431.

The Supreme Court of Alaska has also held the defendant's absence at the rendering of the verdict could not be harmless error:

> A substantial right was affected by Lee's being absent when the jury returned its verdict. Had he been present he could have insisted on a poll of the jury being taken. While the judge did ask the jury generally if this was their verdict, the members were not polled individually. Lee was deprived of the right personally to confront the jury. Particularly in light of the jury's difficulty in reaching a decision, Lee's absence at the return of the verdict was significant. The psychological distinction between a general poll in his absence, and an individual poll requiring each juror to assume the burden of his decision and affirm it in the defendant's presence is not a minor one. Under these circumstances we hold that substantial rights were affected, and that the error cannot be regarded as harmless.

(Footnote omitted.) *Lee v. State,* 509 P.2d 1088, 1094 (Alaska 1973). Likewise, the Kentucky Court of Appeals has held:

> There is no merit in the contention that appellant was not prejudiced because his attorney polled the jury, for he had the right to see and know that the entire jury was assenting to the verdict by polling the jury and requiring

each juror when face to face with him to state that the verdict was his verdict.

*Riddle v. Commonwealth,* 216 Ky. 220, 222, 287 S.W. 704 (1926).

The trial court's error in receiving the jury's verdict in Rice's absence, which necessarily violates CrR 3.4 and the common law, cannot be found harmless even under the more lenient standard of review for nonconstitutional error. Because Rice did not waive his constitutional right to be present, there was also constitutional error, and a fortiori that error cannot be found harmless under the more stringent standard of harmlessness beyond a reasonable doubt. *See, e.g., State v. Nist,* 77 Wn.2d 227, 461 P.2d 322 (1969).

## V

I would hold that allowing the prosecutor to argue to the jurors that they should put themselves in the children's shoes in deciding the sentence, and allowing the jury to render its verdict while Rice was unconscious were both reversible errors. I would reverse the death sentence and remand for proceedings required by RCW 10.95.050. Because I find the errors discussed above require reversal in themselves, I do not discuss here other errors I perceive in the sentencing phase of Rice's trial.

PEARSON, C.J., and CUNNINGHAM, J. Pro Tem., concur with UTTER, J.

Reconsideration denied August 16, 1988.